In the Matter of FISCHBACH AND MOORE, INCORPORATED, Appellant, v NEW YORK CITY TRANSIT AUTHORITY et al., Respondents.

Second Department, January 29, 1981

### APPEARANCES OF COUNSEL

*M. Carl Levine, Morgulas & Foreman (Jerrold Morgulas* of counsel), for appellant.

*Joan Offner (Walter J. McCarroll* of counsel), for New York City Transit Authority and others, respondents.

*Anderson Russell Kill & Olick, P. C. (John E. Daniel, James P. Heffernan* and *Erich R. Eiselt* of counsel), for General Electric Company, respondent.

### OPINION OF THE COURT

MOLLEN, P. J.

The primary issue presented on this appeal is whether a municipal agency may obtain cost concessions on a public project through postbid negotiations with the lowest responsible bidder. Our determination necessarily depends upon an examination of the policy considerations underlying the practice of sealed competitive bidding for public contracts.

We turn first to a review of the pertinent and undisputed facts.

In June, 1979 the New York City Transit Authority published an invitation for bids on its Contract No. P-36300. The contract called for the furnishing and installation of certain supervisory control equipment for power substations of the city's transit system. Two bids were received. The General Electric Company submitted a low bid of $28,676,-386, some $200,000 less than the bid submitted by the petitioner.

After the bids were opened, the Transit Authority made inquiries of the low bidder, General Electric, regarding one item of its bid. The authority asked that certain costs listed under item 20 of the bid be eliminated on the ground that they were duplicative of those listed in a separate item. General Electric ultimately acceded to the request, lowering its bid by $891,050. The authority also expressed concern over the fluctuating price of copper which, it felt, had been unreasonably high when the bids were prepared and which had come down since they were opened. After some negotiation, an accord was reached by which it was agreed that, if copper prices fell below a certain level at the time of shipment, General Electric would reduce its bid to reflect the decrease. An increase in copper prices beyond that originally contemplated in the bid, however, would not be passed along to the authority.

Although General Electric made these concessions and although, as finally arrived at, its bid was only 3.9% higher than the authority's most recent revised cost estimate, the authority did not award the contract to General Electric. Instead, it rejected all bids and called for a new round of bidding. The authority apparently took that action on the basis of representations made to it by the Westinghouse Electric Corporation, a nonbidder. It appears that, while General Electric's low bid was pending, the Transit Authority had conducted private negotiations with Westinghouse, obtaining a commitment that, if the contract were rebid, Westinghouse would submit a bid lower than General Electric's.

No new round of bidding was ever held, however, because,

upon the rejection of its bid, General Electric instituted a CPLR article 78 proceeding to enjoin the authority from rebidding the contract and to compel the agency to award the contract to General Electric. Special Term (per JONES, J.) *(General Elec. Co. v New York City Tr. Auth.,* NYLJ, Sept. 25, 1980, p 15, col 1) granted the petition, finding that the authority had acted improperly in negotiating with a nonbidder while a responsive low bid was pending and that the impropriety had tainted the authority's later decision to reject all bids. The Transit Authority appealed but, immediately prior to oral argument in this court, a settlement was reached. The Transit Authority agreed to withdraw its appeal with prejudice and to award the contract to General Electric as the lowest responsible bidder. In return, General Electric agreed to add to the specifications of its bid a provision for liquidated damages for any extended equipment failure.

The matter did not thus come to a rest, however. Before work on the contract could begin, petitioner, the original unsuccessful bidder, commenced this article 78 proceeding seeking a judgment permanently restraining the Transit Authority from awarding the contract to General Electric and directing that the authority reject all bids and open the contract to a new round of bidding. By a decision and judgment dated November 10, 1980, Special Term (per JONES, J.), denied the petition. This is an appeal from that ruling.

Arguing that the authority's action here violates both the letter and the spirit of the provisions requiring sealed competitive bidding for public contracts, petitioner maintains that a municipal agency is prohibited from engaging in postbid negotiations, even with the established low bidder. Petitioner would require that the agency either accept the low bid *precisely as submitted* or reject all bids and open the contract for a further round of bidding. According to the petitioner, when an agency withholds a contract pending postbid negotiations with a low bidder, it is, in essence, conducting what amounts to a new round of bidding in which only the low bidder, and no one else, may participate. In the petitioner's view, such a practice admits of at least two major flaws. First, it is unfair to other bidders since, if given the opportunity to participate in the "negotiations,"

they might be willing to attempt to obtain the contract by lowering their bids below that ultimately offered by the low bidder. Second, it is unfair to the low bidder since it permits the agency to coerce unfair and unwarranted concessions through a stated or implied threat that, unless the concessions are made, the contract will be rebid and thus will be lost to the low bidder.

Although the petitioner's argument has a certain surface appeal, we conclude that the broad prohibition it seeks is neither compelled by statute nor required by considerations of public policy.

The controlling statutory provisions are section 103 of the General Municipal Law and subdivision b of section 343 of the New York City's Charter. The former provides, in pertinent part: "1. Except as otherwise expressly provided by an act of the legislature or by a local law adopted prior to September first, nineteen hundred fifty-three, all contracts for public work involving an expenditure of more than five thousand dollars and all purchase contracts involving an expenditure of more than three thousand dollars, shall be awarded by the appropriate officer, board or agency of a political subdivision or of any district therein * * * *to the lowest responsible bidder* furnishing the required security after advertisement for sealed bids in the manner provided by this section * * * Such officer, board or agency may, in his or its discretion, reject all bids and readvertise for new bids in the manner provided by this section." (Emphasis supplied.)

Section 343 of the New York City Charter provides, in pertinent part: "b. The agency letting the contract may reject all bids if it shall deem it for the interest of the city so to do; if not, it shall, *without other consent or approval, award the contract to the lowest responsible bidder*, unless the board of estimate by a two-thirds vote shall determine that it is for the public interest that a bid other than that of the lowest responsible bidder shall be accepted. Tie bids are to be decided by the agency letting the contract and the award made. Whenever a contract is awarded to another than the lowest bidder, except by action of the board of estimate, the agency awarding the same shall file in its office

and in the offices of the comptroller, the commissioner of general services and the city clerk a statement in detail of the reasons therefor. Notwithstanding any other provision of this subdivision, the agency letting the contract may award the contract to other than the lowest bidder upon prior approval of the corporation counsel and the comptroller." (Emphasis supplied.)

It is at once apparent that these provisions do not contain any language which would prohibit an agency from engaging in postbid negotiations with a low bidder prior to awarding the contract. (Cf. *Merritt Plumbing v City of New York*, 55 AD2d 552.) Hence, if the petitioner is to prevail, it must demonstrate that the practice, although not violative of the letter of the law, is contrary to its spirit. We conclude that it is not.

The rapid growth of our counties, cities, towns and villages has brought with it a vast increase in the sums annually expended for public projects. This, in turn, has provided a fertile source of profit for contractors who are willing and able to fulfill the needs of the municipality. (See *Jered Contr. Corp. v New York City Tr. Auth.*, 22 NY2d 187, 193.) In deciding how to spend taxpayers' money, officials authorized by law to contract on behalf of the municipality owe their total and undivided allegiance to the interests of the public whom they serve. The public, of course, receives its greatest benefit when it obtains the highest quality of work at the best possible price, and that is the goal for which municipal officials must continually strive. They are under no obligation to provide work for contractors and have no independent responsibility to guard the interests of those bidders who are eager to achieve maximum profit from public contracts.

That is not to suggest that a municipal agency may act unfairly or arbitrarily in connection with the letting of public contracts. To the contrary, the law and public policy mandate that bidders be treated equally and fairly in their pursuit of public work. That requirement, however, is not grounded in a concern for the welfare of the bidder, but rather in the firm belief that fairness in the bidding process is inextricably connected with the objective of obtaining the

best quality work at the lowest possible price. Bidding laws are predicated upon the principles of the free marketplace which hold that the most desirable offer from the perspective of both quality and price will emerge through a process of vigorous, free and fair competition among the greatest number of potential contractors. (See *Asbury Park Press v City of Asbury Park*, 23 NJ 50; 3 Yokley, Municipal Corporations, § 442.) Hence, our courts have consistently held that "[t]he provisions of the statutes and ordinances of this State requiring competitive bidding in the letting of public contracts evince a strong public policy of fostering honest competition in order to obtain the best work or supplies at the lowest possible price. In addition, the obvious purpose of such statutes is to guard against favoritism, improvidence, extravagance, fraud and corruption. They 'are enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders, and should be so construed and administered as to accomplish such purpose fairly and reasonably *with sole reference to the public interest'* (10 McQuillin [Municipal Corporations (3d ed)] § 29.29, p. 322; emphasis added)." *(Jered Contr. Corp. v New York City Tr. Auth.*, 22 NY2d 187, 192-193, *supra;* see, also, *Matter of Signacon Controls v Mulroy*, 32 NY2d 410, 413; *Matter of Allen v Eberling*, 24 AD2d 594; cf. *Matter of Exley v Village of Endicott*, 51 NY2d 426.)

Petitioner contends that these purposes are not served by the conduct of the Transit Authority here, *inter alia*, because the petitioner, or perhaps some other bidder, if given the opportunity at a second round of bidding, might better conserve public funds by submitting a bid more favorable than the one the authority ultimately obtained from General Electric. The flaw in this argument, aside from its speculative nature, is that it exaults one of the goals of the bidding statutes—obtaining the lowest price for a particular contract—over the fundamental principles upon which those statutes are founded. Competitive bidding statutes are intended to secure the lowest practicable price for each public project. Equally important, however, they are designed to achieve that aim within a strictly enforced framework of fair competition, for the provisions are predicated upon the belief that, in the long run if not in each individual case,

the public will receive the best value if its officials consistently adhere to a policy of impartiality and fair dealing in letting public contracts. Hence, the petitioner's suggestion that, if General Electric's bid were rejected, a better price might be achieved for this particular project, is insufficient to warrant a departure from the established practice of awarding public contracts to the lowest responsible bidder. And the petitioner has offered no other argument which would lead us to believe that the award to General Electric is inconsistent with the principles of competitive bidding.

As the name suggests, the practice of competitive bidding seeks value through free and fair competition. Logic and experience teach that competition for public contracts may be promoted only by fostering a sense of confidence in potential bidders that their bids will be fairly considered and that they will not be deprived of any substantial benefit afforded to their competitors. (See *Molloy v City of New Rochelle*, 198 NY 402; *Matter of Glen Truck Sales & Serv. v Sirignano*, 31 Misc 2d 1027 [HOPKINS, J.]). To that end, courts have held, for example, that a municipality may not ease contract specifications after bids have been submitted or waive material variances in bids received. (See e.g., *Le Cesse Bros. Contr. v Town Bd. of Town of Williamson*, 62 AD2d 28, affd 46 NY2d 960; *Blandford Land Clearing Corp. v Davidson*, 62 AD2d 1007; 10 McQuillin, Municipal Corporations [3d ed], § 29.65.) Were it otherwise, legitimate bidders, who might have been willing to reduce their bids had they known that the specifications of the job would be relaxed, would be unfairly deprived of the opportunity to do so. This, combined with the danger of favoritism, fraud or corruption inherent in a selection process conducted under such circumstances, might well discourage contractors from bidding on future contracts, thus diminishing competition to the detriment of the public. *(Le Cesse Bros. Contr. v Town Bd. of Town of Williamson, supra.)* Similarly, as the cases relied upon by the petitioner suggest, a municipality may not engage in postbid negotiations through which a contractor *other than the low bidder* may become the low bidder. (See, e.g., *American Totalisator Co. v Seligman*, 34 Pa Cmwlth 391, affd 489 Pa 568; *Platt Elec. Supply v City of Seattle*, 16 Wash App

265.) Were this practice permitted legitimate bidders might be reluctant to participate in the bidding process because of a lack of confidence that their sealed bids would actually determine the contract award. (Cf. *Matter of Delta Chem. Mfg. Co. v Department of Gen. Servs. of City of N.Y., Div. of Municipal Supplies*, 106 Misc 2d 617.) Moreover, the same reluctance might result if the municipality were permitted to reject all bids arbitrarily, and, hence, "the bidding law may not be evaded under the color of a rejection." (10 McQuillin, Municipal Corporations [3d ed], § 29.77, p 438; see, also, *Matter of Delta Chem. Mfg. Co. v Department of Gen. Servs. of City of N.Y., Div. of Municipal Supplies*, supra.) *

The crucial question, therefore, is whether the municipal agency, in seeking to conserve public funds, has abided by those rules designed to promote competition and to avoid favoritism and corruption. If it has, then the requirements of the competitive bidding law are satisfied. Significantly, in *City of Lakeland v Union Oil Co. of Calif.* (352 F Supp 758), the court employed this standard and approach in rejecting a claim which was virtually identical to the one advanced by the petitioner at bar. The court wrote (p 763):

"It is axiomatic in Florida that a contract is absolutely void if made by public officers in derogation of a statutory duty to solicit competitive bids. The object of such legislation is to prevent favoritism or extravagance and to protect the public from collusive contracts. As a consequence, the statute should always be liberally construed to foster that purpose and avoid any likelihood of circumvention even in the absence of fraud or bad motive * * *

"In this instance, however, those salutary principles are clearly inapplicable. Indeed, it might even be said that the same principles and purposes, from the public's point of view, require that the contract be applauded and validated, not condemned, because it is plain by any measurement that the City got the best of the bargain. It is equally clear that proper procedures were followed. Detailed specifications

---

* It was on these grounds that Special Term initially enjoined the Transit Authority from rejecting all bids based upon its private postbid negotiations with Westinghouse, a nonbidder.

were prepared and bids were solicited and received without irregularity of any kind. Union Oil was the low bidder, and in the process of awarding the contract the City was successful in negotiating a price even better than that contained in the bid. The post bid negotiations did not involve any departure from the original specifications * * * and neither is this a case in which the City undertook to negotiate with a high bidder to the exclusion and prejudice of a lower bidder * * * The record is also devoid of any suggestion of fraud or favoritism".

Precisely the same analysis is appropriate in the instant case. First, the record here contains no suggestion of favoritism, fraud or corruption. General Electric was fairly and properly established as the lowest responsible bidder in a round of bidding which has never been challenged. Hence, from the outset, General Electric was fairly entitled to primary consideration for the contract award. Second, the public interest was advanced since the authority obtained through negotiations a reduction in cost for the project. Three modifications were made on the initial bid: (1) the elimination of duplicative costs; (2) the agreement regarding copper prices; and (3) the inclusion of a provision for liquidated damages. Each represented an actual or potential savings on the price of the project. Third, the negotiations resulted in no departure from the contract's original specifications and no concessions whatsoever were made to General Electric. Thus no unfair benefit was afforded to General Electric at the petitioner's expense. Hence, the award of the contract to General Electric after postbid negotiations was not, under the circumstances at bar, inconsistent in any way with the policies underlying the bidding statutes.

We do recognize that, as petitioner suggests, postbid negotiations, even with a low bidder, may be conducted in such a manner as to violate the principles of competitive bidding. It is possible that an agency, through the threat of rejecting all bids, might attempt to coerce a low bidder to making unfair and unwarranted concessions. Yet, the bidder in such circumstances would not be without remedy since, as previously noted, the actions of an agency in awarding or in refusing to award a contract are not beyond judicial review and will be set aside where arbitrary. (See *Matter of Ca-*

*rucci v Dulan*, 24 AD2d 529; *Matter of Gottfried Baking Co. v Allen*, 45 Misc 2d 708 [COOKE, J.].)

In the case at bar, the Transit Authority was guilty of no such impropriety. It acted reasonably in seeking elimination of duplicative costs and in protecting itself against what it deemed to be inflated copper prices. And the liquidated damages provision was a reasonable concession, protective of the public interests. Moreover, the ultimate price of the bid was fair, being only slightly higher than the Transit Authority's own revised cost estimate and well below the original low bid.

Accordingly, we hold that the award of the contract to General Electric, the low bidder, under the circumstances at bar, was proper and should be sustained. The judgment appealed from is therefore affirmed.

HOPKINS, LAZER and GIBBONS, JJ., concur.

Judgment of the Supreme Court, Kings County, dated November 10, 1980, affirmed, without costs or disbursements.