SINRAM-MARNIS OIL COMPANY, INC., Respondent, v CITY OF NEW YORK, Appellant.

First Department, August 4, 1988

APPEARANCES OF COUNSEL

*Terry Myers* of counsel *(Herbert Rubin, David B. Hamm* and *Miriam Skolnik* on the brief; *Herzfeld & Rubin, P. C.,* attorneys), for respondent.

*Elizabeth Dvorkin* of counsel *(Edward F. X. Hart* on the brief; *Peter L. Zimroth, Corporation Counsel,* attorney), for appellant.

### OPINION OF THE COURT

MILONAS, J.

In April of 1983, defendant City of New York, through the Department of General Services, solicited bids for contracts to supply fuel oil and kerosene for the period of July 1, 1983 to June 30, 1984. All interested parties were provided with two documents, the standard form of contract, which includes general instructions and conditions, and the requirement contract for fuel oil and kerosene. It is undisputed that these two documents together constitute a binding agreement. According to the standard form of contract, the seller's bid is considered a firm offer such that "[t]he bidder will accept any awards * * * if they are made within forty-five calendar days" of the opening of bids. However, "[i]f no award is made within forty-five days and the bidder desires to withdraw his bid, he must do so in writing; otherwise his bid remains in effect." The contract can be modified only in writing and "in a manner not materially affecting the substance hereof, in order to carry out and complete more fully and perfectly the work herein agreed to be done and performed, provided such changes do not result in a net change in cost to the City or to the Seller of the Work to be done under the Contract." Under the terms of the requirement contract, the bid amount must encompass the cost of the New York State gross receipts tax, which cannot be shown as a separate line item, although the vendor is required to indicate whether or not the bid price contains the gross receipts tax.

Plaintiff Sinram-Marnis Oil Company, Inc., was the low bidder. At the time of its bid, plaintiff was exempt from the gross receipts tax since it was engaged primarily in the sale of fuel for residential purposes. On June 26, 1983, the New York State Legislature adopted a new tax on petroleum businesses, effective June 30, 1983 (Tax Law § 300 *et seq.,* added L 1983, ch 400, § 8). A 3¼% tax was imposed upon the sale of fuel oil by companies previously exempt from the operation of the

law, such as plaintiff herein. In the requirement contract which plaintiff had filled out as part of the bidding process, it had, notwithstanding that the tax was not then applicable to the transaction, checked the box marked "yes" with respect to the question of whether the price included the gross receipts tax.

The Deputy Commissioner of the Department of General Services, Carla Lallatin, sent plaintiff a letter of intent, dated June 21, 1983, to enter into a contract. The bid's 45-day firm offer period expired on June 26, 1983, after which plaintiff was entitled to revoke its bid at any time up to the point that the city accepted the company's offer. On July 1, 1983, plaintiff's counsel wrote to Commissioner Lallatin that the gross receipts tax "has not been included in our bid price under this contract. In view of the dramatic impact this 3¼% gross receipts tax will have on our business, we must advise you of our intention to charge this tax to the City of New York, as a separate line item on our invoices, in connection with purchases made pursuant to this contract."

The city formally accepted plaintiff's bid pursuant to its notice of award, dated July 6, 1983. The accompanying summary of award contained the price that plaintiff had quoted in its bid, which did not encompass the gross receipts tax. Commissioner Lallatin acknowledged plaintiff's July 1st communication in a letter dated July 8, 1983 wherein she asserted that "[p]lease be advised that your letter of July 1, 1983, is being forwarded to the Corporation Counsel for a formal opinion regarding the payment of the gross receipts tax. I will keep you informed of the status of this matter and send you a copy of the opinion as soon as I receive it." Thereafter, the city placed orders for fuel oil with plaintiff in July, August and September of 1983. When plaintiff added the 3¼% gross receipts tax to its invoices, the city refused to remit the amount of the tax. The company then notified the city that it would suspend deliveries unless the deficiency was paid. The next day, the Commissioner of the Department of General Services, Robert Litke, informed plaintiff that it was in default of the contract. The city subsequently turned to other suppliers to meet its need for fuel oil and kerosene. It should be noted that the city apparently never followed up on its statement that the opinion of the Corporation Counsel would be solicited and plaintiff advised accordingly.

Plaintiff commenced the instant declaratory judgment action in May of 1984. In its complaint, the company sought a

declaration that the city was responsible for payment of the gross receipts tax. The city responded by urging that the contract price was the bid price and that the seller was legally precluded from unilaterally raising its price; it also counter-claimed for the difference between the bid price and the cost of obtaining fuel from substituted vendors after plaintiff refused to continue performance. Defendant City of New York then moved, and plaintiff cross-moved, for summary judgment. In denying defendant's motion and granting that of plaintiff, the Supreme Court concluded that "[t]he July 1, 1983 letter did constitute a revocation and/or withdrawal of the first offer * * * Although the letter did not contain the words revocation or withdrawal, the letter contained a modification of a material element of the offer which effectively revoked the former offer * * * The letter was sent within the time frame in which a bid could be withdrawn. Despite receiving this communication which evidenced plaintiff's unwillingness to proceed with the contract under its initial bid, the City proceeded to formalize the contract, therefore acknowledging its acceptance of the new terms. The City, by continuing to do business with Sinram after a material change in the bid of Sinram, accepted Sinram's proposal."

The issue of whether a supplier is entitled to pass along the cost of the gross receipts tax where such item was not included in the bid price was recently decided by this court in *Burnside Coal & Oil Co. v City of New York* (135 AD2d 413). In that case, we declared that (at 414-415):

"The issue at hand is not whether the tax applies to plaintiff or whether an oil company can pass the tax on to a municipal customer, for clearly the answer to both these questions is yes. Rather, the question we must determine is whether under the terms of these contracts plaintiff may pass the tax along to the city. The answer to that is no. The bidding specifications were clear in requiring that any gross receipts tax liability was to be subsumed within the bid itself as a cost of doing business and that the tax could not be billed later on as a separate line item. Thus, the contract was clear in specifying that the tax could not be passed on to the defendant, unless it was included in the bid price of the lowest responsible bidder.

"While plaintiff was exempt from the tax when it submitted its bid and, accordingly, did not incorporate the tax liability in its over-all price bid, it had the opportunity to withdraw its bid after the law became effective. Not only did it not do so,

but on the day the new tax law became effective, July 1, 1983, it accepted assignment of another fuel contract with the city. There is nothing in the new law which requires the oil company to pass on the tax to the consumer. The tax is directed at the oil company in return for the privilege of doing business in this State. As opposed to the statute, it is the contract terms which will dictate who shall ultimately bear the burden. Not having included the tax when it placed its bid, because it was then inapplicable, and not having exercised its option to withdraw its bid after the tax did become applicable, plaintiff may not unilaterally modify the contract terms at the defendant's expense. *(Manhattan & Queens Fuel Corp. v Village of Rockville Centre,* 126 AD2d 523, 524.)"

The Court of Appeals in *Manhattan & Queens Fuel Corp. v Village of Rockville Centre* (72 NY2d 824), wherein plaintiff fuel company had sought reimbursement from defendant municipality for gross receipt taxes paid to the Tax Commission, recently observed that while a supplier could lawfully pass along this tax burden to a municipal corporation, plaintiff had not done so under its contract with defendant. In addition, the court stated therein, "[p]laintiff does not claim impracticality or impossibility of performance, but merely claims that the cost of its performance under the contract has increased due to the change in the Tax Law. There is no basis for plaintiff's claim that defendant is contractually bound to assume this tax burden. Plaintiff, being the party legally obligated to pay the gross receipts tax, must bear the burden of its increased cost in the performance of the contract" *(supra* at 825).

There is a distinction between the present situation and that in *Burnside Coal & Oil Co. v City of New York (supra),* as well as the foregoing Court of Appeals case, since plaintiff herein wrote to the city on July 1, 1983, before the latter had formally awarded the contract, to advise that it intended to charge defendant for the gross receipts tax. Thus, the crucial question is whether plaintiff's letter constituted a revocation of its bid in its original form. In that connection, the Court of Appeals has held that "the purpose of the laws in this State requiring competitive bidding in the letting of public contracts is 'to guard against favoritism, improvidence, extravagance, fraud and corruption.' * * * These laws were not enacted to help enrich the corporate bidders but, rather, were intended for the benefit of the taxpayers. They should, therefore, be construed and administered 'with sole reference to the public interest' " *(Matter of Conduit & Found. Corp. v Metropolitan*

*Transp. Auth.,* 66 NY2d 144, 148; *see also, Depot Constr. Corp. v City of New York,* 46 NY2d 859). Since the public interest is always the paramount concern, common-law contract principles must be applied only in conjunction with a consideration of what is advantageous to the taxpayer.

While it is doubtful that the July 1st letter could be deemed a withdrawal of its bid even under common-law standards, as nothing therein indicates an unwillingness to continue with the contract, the fact remains that plaintiff clearly wanted to supply the city with fuel oil and kerosene but was demanding the right to a separate line item billing for the gross receipts tax. It is evident, however, that the company was precluded from effectuating any modification in the bid following its submission. The standard form of contract specifically provides that once the 45-day firm offer period has expired, a bidder has only two options, to withdraw the bid or leave it in place. Although modifications, which must be in writing, are permitted, these alterations may not "result in a net change in cost to the City or to the Seller". The modification being sought by plaintiff involved a considerable increase in cost and was, consequently, inconsistent with the terms of the contract. Moreover, the requirement contract mandates that the fuel oil gross receipts tax be part of the bid price; this item may not be billed separately.

Section 103 (2) of the General Municipal Law states that advertisements for public bidding "shall contain a statement of the time when and place where all bids received pursuant to such notice will be publicly opened and read." Thereafter, that same provision requires that "[a]ll bids received shall be publicly opened and read at the time and place so specified." Plaintiff, as the low bidder, was awarded the subject contract according to the standards of the competitive bidding law. By now insisting that it be permitted to modify its original bid and bill the city for the gross receipts tax, plaintiff is, in effect, submitting an entirely new bid, thereby claiming a competitive advantage over other potential suppliers. This is simply incompatible with the purposes and legal dictates of the bidding process. In *Matter of Tufaro Tr. Co. v Board of Educ.* (79 AD2d 376), the court rejected an attempt to invoke the "principle of contract law which holds that an 'offer' which is not accepted is 'necessarily rejected' * * * To apply that principle * * * by equating a 'bid' with an 'offer' would be to undermine the practice of competitive bidding for public contracts" (at 381). Further, the reasons militating against

permitting postbid modifications were cogently explained in *Matter of Fischbach & Moore v New York City Tr. Auth.* (79 AD2d 14, *lv denied* 53 NY2d 604): "As the name suggests, the practice of competitive bidding seeks value through free and fair competition. Logic and experience teach that competition for public contracts may be promoted only by fostering a sense of confidence in potential bidders that their bids will be fairly considered and that they will not be deprived of any substantial benefit afforded to their competitors * * * To that end, courts have held, for example, that a municipality may not ease contract specifications after bids have been submitted or waive material variances in bids received * * * Were it otherwise, legitimate bidders, who might have been willing to reduce their bids had they known that the specifications of the job would be relaxed, would be unfairly deprived of the opportunity to do so. This, combined with the danger of favoritism, fraud or corruption inherent in a selection process conducted under such circumstances, might well discourage contractors from bidding on future contracts, thus diminishing competition to the detriment of the public * * * Similarly, as the cases relied upon by the petitioner suggest, a municipality may not engage in postbid negotiations through which a contractor *other than the low bidder* may become the low bidder * * * Were this practice permitted legitimate bidders might be reluctant to participate in the bidding process because of a lack of confidence that their sealed bids would actually determine the contract award" *(supra,* 79 AD2d, at 20-21).

The court in *Matter of Fischbach & Moore v New York City Tr. Auth. (supra)* then proceeded to define the circumstances under which postbid modifications could be possible. According to the court, "[t]he crucial question, therefore, is whether the municipal agency, in seeking to conserve public funds, has abided by those rules designed to promote competition and to avoid favoritism and corruption" *(supra,* at 21). The rules referred to by the court were that there cannot be any suggestion of favoritism, fraud or corruption; the public interest must be advanced through a reduction in the cost of the project; and there may be no departure from the contract's original specifications and no concessions to the bidder. In the instant matter, acceptance of plaintiff's new proposal would not only have resulted in a substantial increase in cost to the city, but allowing the amendment would have been unfair to the other bidders. It is certainly not inconceivable that, unlike

plaintiff, one or more of the next lowest bidders would have been willing to absorb some or all of the gross receipts tax.

Plaintiff contends that common-law principles are often applied in order to interpret or enforce contracts entered into under the public bidding laws, citing *City of New York v Long Is. Airports Limousine Serv.* (62 NY2d 846), *Maross Constr. v Central N. Y. Regional Transp. Auth.* (107 AD2d 1010, *revd on other grounds* 66 NY2d 341), *City of Syracuse v Sarkisian Bros.* (87 AD2d 984, *affd* 57 NY2d 618) and *Balaban-Gordon Co. v Brighton Sewer Dist.* (41 AD2d 246). However, none of the cases relied upon by plaintiff supports the proposition that a bidder may successfully amend the terms of a contract which, as in the present matter, are neither contradictory nor confusing and where no mistake was made in construing the contractual specifications. Indeed, even where a bidder seeks to be relieved from "an error in a value judgment in estimating the requirements or costs necessary to fulfill a contract" *(see, Balaban-Gordon Co. v Brighton Sewer Dist., supra,* at 249), "[t]he decisive factual question is whether the mistake is one the courts will excuse. Then, if the mistake concerns a material matter in an executory contract under circumstances where relief to the bidder results in no damage to the municipality but enforcement results in serious harm to the bidder, rescission will be granted" *(supra,* at 250-251). The change desired herein by plaintiff would clearly cause a financial hardship to the city and is, therefore, barred not only by the relevant contractual provisions but by the legal standards pertaining to competitive bidding. Moreover, in the absence of any material facts in dispute, defendant is also entitled to summary judgment in connection with its counterclaim.

Unfortunately, the fervor of the dissent is unsupported by its substance. Thus, on the one hand, the dissent finds that petitioner's letter of July 1, 1983 effectively revoked the bid, while, on the other, he states that "I think the city ought to be held to the bargain which it may be fairly said to have made in its own interest and that of the public." However, if the bid has been revoked, how can the city then proceed to award a revoked bid? The illogical and contradictory nature of the dissent's argument is further indicated by the fact that although he asserts that plaintiff did revoke its original bid, he later treats the revocation as not such at all but, rather, a modification and then proceeds to disregard completely the significance of the standard form of contract, which prohibits modifications except "in a manner not materially affecting the

substance hereof * * * provided such changes do not result in a net change in cost to the City or to the Seller or to the work to be done under the Contract." Consequently the so-called revocation is not really a revocation but a modification, and the contract terms may be ignored because "[a]t the time of the bid modification there was no contract to be modified. The cited provision then has no application." In the final analysis, therefore, the dissent would sanction plaintiff's unilateral modification of its bid and compel the city to accept that modification since "[g]iven the real options available to the city, all of which involved additional costs, the alternative represented by the plaintiff's modified bid was in all probability the least costly one." Yet, whether or not plaintiff's amended proposal was the least costly is purely speculative. Certainly, to permit a bidder to materially modify its proposal without affording other potential suppliers the opportunity to submit their offers based upon the changed circumstances, which is what the dissent appears to urge, is entirely inconsistent with the purposes and legal dictates of the competitive bidding process.

Order and judgment (one paper) of the Supreme Court, New York County (Karla Moskowitz, J.), entered on March 24, 1987, which, pursuant to a memorandum decision of the court (George Bundy Smith, J.), dated December 24, 1986, denied the motion by defendant City of New York for summary judgment, granted the cross motion by plaintiff Sinram-Marnis Oil Company, Inc. for summary judgment and granted judgment in plaintiff's favor in the amount of $94,455.41, together with interest, costs and disbursements, should be reversed on the law, defendant's motion for summary judgment dismissing the complaint and on its counterclaim should be granted and plaintiff's cross motion denied, and the matter remanded for an inquest to determine the amount of recovery on defendant's counterclaim, without costs or disbursements.

MURPHY, P. J. (dissenting). Plaintiff Sinram-Marnis (hereinafter Sinram) was the low bidder for a fuel supply contract offered by defendant City of New York. Accordingly, on June 21, 1983, the city notified Sinram of its intention to award it the contract. On June 26, 1983, however, before a formal award of the contract had been made, plaintiff's bid which had been irrevocable for the immediately proceeding 45-day "firm offer period", became revocable. Also on June 26, the State Legislature enacted a new gross receipts tax (Tax Law § 300 *et*

*seq.,* as added by L 1983, ch 400, § 8) applicable to residential fuel suppliers, such as the plaintiff, previously exempt from the tax *(see generally, Manhattan & Queens Fuel Corp. v County of Nassau,* 113 AD2d 595, *affd* 68 NY2d 833). Because the gross receipts tax was not applicable to it at the time it submitted its bid, plaintiff had not included the tax obligation in its bid price. Realizing that the removal of the exemption would cause it to incur a substantial tax obligation in connection with its performance of the contract with the city, plaintiff sought to pass the tax through to the city as it clearly would have been able to do—indeed would have been required to do*—had the tax been applicable at the time of the submission of the bid. Thus, on July 1, 1983, before the formal award of the contract and at a time when plaintiff's bid was expressly revocable, plaintiff's general counsel, Timothy W. Ulrich, wrote Department of General Services Deputy Commissioner, Carla Lallatin:

"As you are no doubt aware, the Legislature has recently passed, and the Governor has signed, a law which creates a new Article 13A of the Tax Law imposing a 3¼% gross receipts tax on 'petroleum businesses' in New York. This new law becomes effective on July 1, 1983.

"This law was not in effect, and was not even proposed, at the time we submitted our bid for this contract. Accordingly, this new tax has not been included in our bid price under this contract. *In view of the dramatic impact this 3¼% gross receipts tax will have on our business, we must adivse [sic] you of our intention to charge this tax to the City of New York, as a separate line item on our invoices, in connection with purchases made pursuant to this contract.*

*"This tax will be added to our invoices for all purchases made on and after July 1, 1983 under this contract.*

"It is our understanding from our review of the new law and our discussions with the State Tax Commission that sales to political subdivisions, such as the City of New York, are not exempt from this tax. *If you have any questions about this or see any problems developing, please contact us as soon as possible."* (Emphasis added.)

On July 6, 1983, without replying to this letter, the city, in a letter hand signed by Commissioner Lallatin, formally

---

* The requirement contract states "Bid prices must include the N.Y. State Gross Receipts Tax, if applicable".

awarded plaintiff the fuel supply contract. Two days later, however, on July 8, Ms. Lallatin responded to Ulrich's letter as follows:

"Please be advised that your letter of July 1, 1983, is being forwarded to the Corporation Counsel for a formal opinion regarding the payment of the gross receipts tax.

"I will keep you informed of the status of this matter and send you a copy of the opinion as soon as I receive it."

Notwithstanding Ms. Lallatin's promise of status reports and a copy of the supposedly forthcoming Corporation Counsel opinion, plaintiff did not succeed in the ensuing weeks in obtaining from the city a statement of its position respecting the gross receipts tax obligation. Plaintiff's phone inquiries to Ms. Lallatin went unanswered and upon contacting the Department of General Services counsel, plaintiff was advised that the city had not yet decided whether to pay the tax. Thereafter, as Mr. Ulrich states in his affidavit, he contacted Mr. Steven Louis, an attorney in the office of the Corporation Counsel. Mr. Louis informed him that a draft memorandum had been prepared regarding the gross receipts tax and that it was expected that the city would pay the tax.

While these largely fruitless inquiries were underway, plaintiff had commenced its performance of the contract, including the gross receipts tax in its bills as a separate line item as it indicated it would in its July 1, 1983 letter. Some city agencies paid the tax and others did not. When negotiations with the city to clarify who would be responsible for payment of the tax proved futile, plaintiff's president on September 29, 1983 wrote Ms. Lallatin:

"In view of the continuing failure of the City to reimburse us for the 3¼% additional charge representing the new New York gross receipts tax referred to by our counsel, Timothy Ulrich, Esq., in his July 1, 1983 letter to you, which became part of the above contract, I am writing to advise that we are suspending deliveries of product unless and until the City pays the said additional charge. Your counsel has stated that if we suspend deliveries, the City will terminate the contract and relet it to the lowest bidder. In order to accommodate the City and afford it an opportunity to relet the contract, if that is its decision, we will continue deliveries for one week from today. If this period is insufficient and you request a reasonable extension, we anticipate that we will accede.

"Our offer to continue deliveries as stated above is subject:

(a) to our prompt receipt of your written reassurance that the City will continue to pay for all product delivered and to be delivered at the rate set forth in the City's version of the above contract, *i.e.,* without the 3¼% additional charge; and (b) our continuing disclaimer of any intention on our part to waive or relinquish any rights or contentions whatever which we may have in the premises.

"We hereby reiterate our continuing offer to continue deliveries in accordance with the terms of the contract, including the additional charge referred to in the July 1, 1983 letter."

By return letter dated September 30, 1983, Department of General Services Commissioner Robert M. Litke notified plaintiff that it was in default. The contract was subsequently relet. The substitute suppliers passed through the gross receipts tax to the city.

Plaintiff commenced this action in May 1984. It sought judgment declaring that it was not liable for any portion of the gross receipts tax which the city paid or would pay pursuant to its contracts with substitute suppliers. Plaintiff also sought reimbursement for the tax liability it had incurred before the contract was terminated. The city counterclaimed for the amount of the gross receipts tax paid by it to substitute suppliers. The parties stipulated that if plaintiff prevailed it would be entitled to $94,455.41, and that if the city prevailed it would be entitled to an estimated sum of $1,202,633.

Both parties moved for summary judgment. The motion court (George Bundy Smith, J.) in a well-reasoned decision granted plaintiff's motion. The court found that the above-quoted July 1, 1983 letter, while not expressly revoking or withdrawing the prior bid, did modify a material provision of the bid and thereby effectively revoked the bid, substituting for it an offer identical to the bid in all respects except that the new tax liability was passed through to the city. The court held that "[d]espite receiving [the July 1, 1983 letter] which evidenced plaintiff's unwillingness to proceed with the contract under its initial bid, the City proceeded to formalize the contract, therefore acknowledging its acceptance of the new terms. The City, by continuing to do business with Sinram after a material change in the bid of Sinram accepted Sinram's proposal."

The city on the present appeal does not dispute that under common-law principles of contract formation a material change in an offer once communicated to the offeree consti-

tutes a revocation of the original offer terminating the offeree's power to accept the original offer. *(See, e.g.,* 1 Corbin, Contracts § 39 [1963]; Farnsworth, Contracts § 3.17 [1982]; 1 Williston, Contracts § 55, at 56-57 [rev ed]; Restatement [Second] of Contracts § 42, comment d.) Nor does the city persuasively argue that the July 1, 1983 letter did not evince a clear intention by Sinram not to abide by the terms of its original bid. The change proposed by Sinram was manifestly of considerable importance to both parties, and if common-law principles have any application, the July 1 letter must be deemed a revocation of the initial bid.

It is the city's position, however, that common-law principles have no application in this situation. The reasons why the city, and for that matter, the majority, feel that the basic rules of contract formation have no relevance to this matter are entirely obscure. So far as can be discerned from the briefs and majority opinion, the argument is that Sinram did not seek to revoke its bid, but rather to effect an undeniably substantial bid modification. Nowhere is it explained why an unambiguous communication by a bidder to the city, at a time when the bid is revocable, that the bidder has no intention of abiding by the terms of its bid, should not be viewed as a revocation of the bid. Instead, the city argues extensively that the bid could not be modified. This may be true, but it is beside the point; the question is not whether the bid could be modified but whether it could be revoked, and whether it could be revoked by a letter such as the one here at issue. The answer to both of these questions is obviously yes. Whether the city was permitted to accept the plaintiff's new offer is a question distinct from whether the new offer, which I note the majority refers to as "an entirely new bid", displaced the original bid. If the July 1 letter accomplished nothing else it terminated the city's power to accept the original bid.

The majority's citation to *Matter of Tufaro Tr. Co. v Board of Educ.* (79 AD2d 376) is left largely unexplained in its opinion. In *Tufaro* the relevant question was whether the Board of Education, after conditionally accepting a bid which it later found necessary to reject because of the bidder's unfitness, was still empowered to accept the next lowest bids. The specific contention addressed by the court in *Tufaro* was that conditional acceptance of the original low bid constituted a rejection of all other bids. The court stated: "Moreover, we reject [the] attempt to prevent that result [the award of the contract to the next lowest bidders] by invoking the principle

of contract law which holds that an 'offer' which is not accepted is 'necessarily rejected' *(Poel v Brunswick-Balke-Collender Co. of N.Y.,* 216 NY 310, 319). To apply that principle in the context of this case by equating a 'bid' with an 'offer' would be to undermine the practice of competitive bidding for public contracts. That practice requires that contract awards go to the lowest *responsible* bidder. The responsibility of a bidder is often determined only after its bid has qualified as the lowest in price. Hence bids are frequently accepted conditionally, subject to a determination of fitness. It would be counterproductive to hold that when such a conditional acceptance is made, all other bids must be deemed forever rejected, for a conditional acceptance contemplates that the agency may turn to the next lowest bidder if the first is found unfit." *(Supra,* at 381.) Obviously, the *Tufaro* court did not, as the majority suggests, say that a bid is never to be treated as an offer. All that was said was that the conditional acceptance of a low bid did not operate as a rejection of all other bids. The *Tufaro* court's refusal to apply the common-law rule cited by the litigants therein, i.e., the rule articulated in *Poel (supra),* was clearly explained by the court's manifestly correct observation that the application of that rule would have seriously interfered with the primary objective of the bidding process, namely, that of affording the public the services of the lowest responsible bidder. By contrast, the court in this case has not articulated any reason why the common-law rules of contract formation should not apply. It is admitted that the bid was revocable and certainly there is nothing inimical to the bidding process in permitting the revocation of bids after the expiration of the firm offer period; it is, after all, only fair that the bidders be given the option of withdrawing their bids after a reasonable period. The only question then is whether the bid was, in fact, revoked and that is an inquiry as to which the common-law principles governing offers and their revocation would seem to have special relevance and utility.

It is very difficult to understand how the city on July 6, 1983 could seriously purport to accept plaintiff's original bid in the face of plaintiff's July 1, 1983 letter advising the city that it would no longer be bound by the bid terms. Yet, that is precisely what the city claims it did. Remarkably, it did so without even attempting to clarify whether, despite plaintiff's representations to the contrary, the original bid was still outstanding. Neither did the city attempt to advise the plaintiff that the newly proposed terms were unacceptable. The

question is whether, under these circumstances, any contract resulted from the July 6, 1983 award and, if so, what contract?

There would ordinarily be little difficulty in concluding, as did the motion court, that an offeree such as the city in this case, ought to be bound by the terms of the offer then outstanding at the time of the offeree's acceptance. This, however, is a public bidding situation and as the city correctly points out, there are significant limitations on its authority to agree to postbid modifications. The general rule, necessary to preserve the efficacy and integrity of the bidding process, is that the low bid must be accepted according to its original terms or not at all. The rule, however, is not without its exceptions. Postbid modifications in the low bid may be permitted in circumstances where 1) there is no suggestion of corruption or favoritism, 2) the public interest is advanced, and 3) the original contract specifications are not altered. *(Matter of Fischbach & Moore v New York City Tr. Auth.,* 79 AD2d 14, 22, *lv denied* 53 NY2d 604.) The city concedes that there was no hint of corruption in this case, and it would appear equally evident that the proposed modification did not alter the contractual specifications of the job to be performed. The more difficult question is whether the public interest in maximum economy would have been advanced by permitting the proposed change.

It is true that the modification would not have reduced the cost to the taxpayer. The alternative to considering the bid modification, however, was not to attempt, as the city now claims it did, to accept the more favorable original bid which had been revoked and was no longer possible of acceptance, but to offer the contract to the next lowest bidder. But none of the bidders had included the subsequently enacted gross receipts tax in their bids which were all revocable by this point, and there is absolutely no reason to suppose that any of the remaining bidders would have willingly absorbed the tax obligation. Nor is there any basis for the supposition that if they had been willing to shoulder the tax, the contract price would have been lower than plaintiff's modified bid. That this was in fact the state of affairs with which the city was confronted would seem conclusively confirmed by the fact that, after terminating plaintiff's contract, the city, evidently unsuccessful in getting one of the original bidders to absorb the tax on otherwise favorable terms, relet the contract, and when the contract was relet the city agreed to absorb the tax.

I note that the speculation in which the city and the majority both indulge, that "one or more of the next lowest bidders would have been willing to absorb some or all of the gross receipts tax", is not only completely unfounded and contrary to any fair inference to be drawn from the record, it is also fundamentally at variance with the city's central contention, namely, that the city was not at liberty to consent to any increase in the original bid prices. It is altogether perplexing to understand how the city can maintain at once that it was not permitted to entertain plaintiff's proposed pass through of the newly imposed tax, but that it would have been permitted to entertain a partial pass through by a higher bidder!

Under the special circumstances obtaining in this case, I do not think it can be said that the city would have exceeded its authority by considering and ultimately accepting plaintiff's modified bid. Given the real options available to the city, all of which involved additional costs, the alternative represented by the plaintiff's modified bid was in all probability the least costly one. I do not think that the city was oblivious to this circumstance when, with full knowledge of the bid modification and without any objection thereto, it awarded plaintiff the contract. Accordingly, I think the city ought to be held to the bargain which it may be fairly said to have made in its own interest and that of the public.

This conclusion is not prevented by that part of the standard form of contract cited by the majority barring *contract* modifications resulting "in a net change in the cost to the City". At the time of the bid modification there was no contract to be modified. The cited provision then has no application. The inclusion of the modified bid terms in the contract formed on July 6, 1983 was by virtue of the agreement itself, not its modification.

Had the city wished to assure itself and its taxpayers the benefit of the bargain peculiar to the contract originally offered—a bargain which owed its existence to the unique circumstance that a subsequently enacted tax could not have been included, as it most certainly would have been otherwise, in the bidders' price calculations—it would have awarded the contract before the expiration of the 45-day firm offer period. Having waited until the bids became revocable, however, the city is not in a position to complain that the bidder exercised its right of revocation as it did. If there was any question in the minds of the city's representatives as to whether plaintiff's original bid had in fact been revoked, the fair and prudent

course would have been to make an inquiry of the bidder as, indeed, the city had been invited to do. But, perhaps because there was no legitimate basis for believing that any bidder would willingly agree to assume an unanticipated tax liability of between 1 and 2 million dollars, and fearing the issuance of a revocation the significance of which it would be impossible to litigate over, the city eschewed all inquiry and made an award in the lately expressed, although completely unjustified hope that it might yet obtain the benefit of the original bargain. Now this court places its seal of approval on this course of conduct, reasoning that the principles of contract law requiring a different result have application "only in conjunction with a consideration of what is advantageous to the taxpayer."

While it is true that the Court of Appeals in *Matter of Conduit & Found. Corp. v Metropolitan Transp. Auth.* (66 NY2d 144) stated that the statutes governing competitive bidding were to "be construed and administered 'with sole reference to the public interest' " (at 148, citing 10 McQuillin, Municipal Corporations § 29.29, at 302 [3d rev ed]), it does not follow that in this case, where the principal question is not one of statutory interpretation or administration, but one of whether a particular bid was revoked prior to its purported acceptance, that accepted neutral principles of common-law contract adjudication may be summarily dispensed with simply because their application would produce a result disadvantageous to the taxpayer. In the recently decided case of *Burnside Coal & Oil Co. v City of New York* (135 AD2d 413) this court chided a bidder wishing to be relieved of the same gross receipts tax obligation as is here at issue, for failing to withdraw its bid as it could have after the tax became effective. Now, posed with a situation in which the bidder *did* effectively withdraw its bid, the response is that that is of no consequence because the withdrawal was not in the taxpayer's interest. In that portion of the *Burnside* memorandum cited in the majority opinion, this court clearly and correctly held, following the lead of the Second Department in *Manhattan & Queens Fuel Corp. v Village of Rockville Centre* (126 AD2d 523, *affd* 72 NY2d 824), that whether the gross receipts tax could be passed through to the city depended upon the terms of the contract agreed to by the city and its supplier. Nowhere in *Burnside* was there a hint of the novel approach now adopted by the majority that, notwithstanding what the parties may be fairly said to have agreed to in their contract, the

tax must be borne by the supplier in order to save the taxpayer from additional expense. Surely the taxpayer's interests, assuming them to have any direct relevance to the adjudication of the particular problem here presented, extend beyond the pecuniary consequences of a particular case to require that the agencies of government, administrative and judicial, deal with individuals fairly and consistently. This is an essential purpose of the competitive bidding laws (see, Matter of Fischbach & Moore v New York City Tr. Auth., supra, at 19-20) as it is of the common law of contracts. Unfortunately, neither the competitive bidding laws nor the contract specifications pursuant to which the subject contract was awarded address the manner in which a bid may be effectively withdrawn. Without direction from either of these quarters, the only principled basis for determining whether a revocation took place is that afforded by the traditional, commonly employed rules of contract formation. Their application leaves no doubt that plaintiff's original bid was in fact withdrawn by its July 1, 1983 letter. And, although the question of whether the city was empowered to accept the new bid is closer because of the significant statutory limitations upon the city's authority to accept any but the original low bid, it would appear clear that the exceptional circumstances in this case brought it within the conditions set forth in Fischbach (supra) and so permitted acceptance of the new bid. That is precisely what the city did when it formally awarded the contract on July 6, 1983.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Karla Moskowitz, J.), entered on March 24, 1987, which, pursuant to a memorandum decision of the court (George Bundy Smith, J.), dated December 24, 1986, denied the motion by defendant City of New York for summary judgment, granted the cross motion by the plaintiff Sinram-Marnis Oil Company, Inc. for summary judgment and granted judgment in plaintiff's favor in the amount of $94,455.41, together with interest, costs and disbursements, should be affirmed.

SANDLER, SULLIVAN and ASCH, JJ., concur with MILONAS, J.; MURPHY, P. J., dissents in an opinion.

Order and judgment (one paper), Supreme Court, New York County, entered on March 24, 1987, reversed, on the law, defendant's motion for summary judgment dismissing the

complaint and on its counterclaim is granted and plaintiff's cross motion for summary judgment denied, and the matter remanded for an inquest to determine the amount of recovery on defendant's counterclaim, without costs and without disbursements.