**WESTINGHOUSE ELECTRIC CORPORATION, Plaintiff,**

v.

**NEW YORK CITY TRANSIT AUTHORITY and Metropolitan Transportation Authority, Defendants.**

No. 87 Civ. 7021 (RWS).

United States District Court, S.D. New York.

April 13, 1990.

Smith, Pachter, McWhorter & D'Ambrosio, Vienna, Va., for plaintiff; Peter M. D'Ambrosio and John V. Snyder, of counsel.

Albert C. Cosenza, Vice President and Gen. Counsel, Brooklyn, N.Y., for defendant New York City Transit Authority; M. Margaret Terry, Scott H. Klein and Theresa R. Joyner, of counsel.

## OPINION

SWEET, District Judge.

Defendants New York City Transit Authority ("TA") and Metropolitan Transportation Authority ("MTA") move for summary judgment dismissing the action of plaintiff Westinghouse Electric Corporation ("Westinghouse"). For the reasons stated below, the motion is granted and the complaint is dismissed.

## THE PARTIES

MTA and the TA are public benefit corporations created by the New York State Legislature pursuant to Public Authorities Law §§ 1201, 1263 to develop and improve commuter transportation in New York City and the greater metropolitan area. Westinghouse is a corporation that engages in diversified manufacturing and construction activities, which embrace government contracting.

## PRIOR PROCEEDINGS

On October 4, 1988, Westinghouse commenced this action to obtain payment from defendants TA and MTA for certain work Westinghouse performed for defendants. Westinghouse contends the disputed work was beyond the scope of performance required by the parties' contract and beyond the scope of the competitive bid it submitted to obtain the contract award. Following extensive discovery conducted by both parties, the TA and MTA moved for summary judgment on October 18, 1989. After adjournments occasioned by requests of the parties to permit additional time to brief the issues, oral argument on the motion was heard on December 15, 1989 at which time it was fully submitted.

## THE FACTS [1]

This lawsuit concerns a public works contract, Contract P–36221 (the "Contract"), bid out by MTA (by its agent, TA) and awarded to Westinghouse, as part of the MTA's multi-million dollar capital program to develop and improve the transportation system of New York City. The Contract was for the purchase and installation of power rectifier equipment at several subway substations, including the Flatbush–Willoughby substations. At issue is whether Westinghouse is entitled to compensation in addition to that provided for under the Contract for certain disputed remote telephone communications work that Westinghouse performed in connection with the Contract.

The work performed was the laying of new cable in subway tunnels to remote destinations of the Flatbush–Willoughby emergency alarm circuit that controls the DeKalb Avenue subway hub (the "Flatbush–Willoughby remote communications work" or the "disputed work"). Westinghouse contends that its accepted bid did not contemplate the performance of the disputed work nor was such work clearly called for under the Contract.

### A. The Bidding for Contract P–36221

On August 5, 1982, TA advertised the Contract and issued a Contract Book setting forth the Contract terms and conditions, the project drawings and specifications, and requirements for bidders' proposal. Although the Book originally called for bid submission by September 29, 1982, several addenda to the Contract were issued over the next three months, resulting in the adjustment of the bid deadline to November 16, 1982.

The specifications issued for the project contained no reference to a requirement that extensive lengths of new telephone cable be installed to run from the Flatbush–Willoughby substations to remote locations. The project drawings, and in particular, Telephone Drawing TE–7, indicated that some cable work would be required, and Drawing TE–1 stated that cable indicated on the drawings was to be new, unless otherwise indicated. Neither drawing specified the quantity of cable in question or the remote destination of most of the cable runs. Drawing TE–7 did schematically indicate that it was incomplete and that additional details as to the scope of the cable runs would be provided by a further drawing to be issued as an Addendum.

The Contract Book recommended site inspection to the bidders, who were urged to visit project sites to inform themselves of the nature and conditions of the work and were presumed by the bidding instructions to have acquired full knowledge of conditions at the sites relating to the work. Bidding Instruction ¶ 7. In addition, the TA conducted a pre-bid tour of inspection for bidders on October 19–20, 1982, which representatives from Westinghouse attended. The pre-bid tour did not go to the site of the disputed Flatbush–Willoughby communications installation, nor did Westinghouse request, at that time or otherwise, an inspection of that location.

On November 4, 1982, the TA issued by mail an Addendum No. 4 to the Contract. In addition to describing the major addition of a circuit breaker house at another site, the Addendum contained three telephone drawings, P–8A, P–9A, and P–10, which provided additional information about the communications work. Westinghouse received the drawings and passed them on to its electrical installation subcontractor, Mass Transportation Electrical Construction Corp ("MTEC") on November 10, 1982, six days before the bidders' proposals were due.

Upon reviewing the drawings, MTEC's estimator for the bid contemplated that the drawings called for "new remote cable to be installed" and further recognized that the drawings represented "a change, a big change here in scope of the telephone

---

1. Except as otherwise noted, the facts recited are undisputed or are as contended by Westinghouse in its opposition to the defendants' Statement under Rule 3(g) ("3(g) Opposition"), to the extent those contentions of Westinghouse are supported by the affidavits and exhibits submitted in opposition.

work, so-called communications work." However, MTEC personnel preparing the bid also understood that it was TA's customary practice to procure this remote cable type of work through its Signals and Communications Department, not the Power Department that had oversight of the Contract in question, and MTEC had not previously performed such remote cable work. Its cable work had been limited in the past to the laying of short lengths of cable within the local area of the substations, and splicing into, rather than replacing, existing cables that ran to remote locations.[2]

MTEC believed it did not have time to survey the site to properly estimate the cost of the remote work, and was under considerable time pressures to prepare its portion of the Westinghouse bid. MTEC and Westinghouse did not seek a formal clarification of the drawings prior to preparing the bid for this work, nor seek opportunity to inspect the Flatbush–Willoughby site.[3] MTEC proceeded to prepare a bid estimate of $438,415 for Job Item 21A (the item number designating the work that included the disputed portion of the communications project), omitting the remote work (the long cable runs) its estimator had been concerned was called for by the Addendum 4 drawings and including in its item price only the cost of doing the local (as opposed to local and remote) cable connections. Westinghouse incorporated MTEC's price without revision in its total bid and submitted the bid to the TA.

## B. Bid Opening and Award

On November 16, 1982, TA opened the sealed bids for the Contract submitted by Westinghouse, English Electric Company, and General Electric Company. Westinghouse was the low bidder, with a bid of $21,121,481. The other bids were $325,000 to $800,000 higher. All the bids were considerably below (19% to 22% lower than) the TA's engineer's overall project estimate of $25.9 million. None of the bidders sought to rescind their bids due to mistake during the 24–hour rescission window provided by the Contract.

The bid analysis by the TA showed significant percentage and ranges of deviation on several particular component bid items, including deviations ranging from 2% (General Electric) to 50% (English Electric) less than engineer's estimate on Item 22U, 44% (General Electric) to 57% (English Electric) less on Item 22V, and 46% (English Electric) to 76% (Westinghouse) less on the disputed communications item in question, Item 21 A. Westinghouse's bid for this pay item was 76% below the TA's engineer's estimate, making it Westinghouse's and also G.E.'s (but not English Electric's) most deviant item bid.[4] The TA engineer's bid analysis concluded from the across-the-board level of lower-than-forecasted bidding that all of the bidders had been successful in obtaining much reduced prices for major items than the prices that had been paid in the previous TA contracts upon which the TA engineer had based his

2. In fact, the Assistant General Superintendent of the Power Department had indicated internally in 1981 to an engineer in the Signals and Communications Department (about a year prior to finalization of the Contract Book) that the $2 million of estimated re-cabling work that had been proposed by the Signals and Communications Department for inclusion in the Contract exceeded the Power Department's budget limitations and should be rescaled to fit within the proposed scope of communications work performed under Power Department contracts. That preliminary estimate was scaled back to $1.8 million. The TA's estimate for all work called for under the Contract totaled $25.9 million.

3. Requests for Contract clarification must be in writing, and ordinarily are to be made ten

working days before bids are due. The Contract book permits such requests to be made upon "such shorter period as "the Authority in its sole discretion shall allow." IFB ¶ 8. Visits to sites require the TA's permission, and at least two days notice to TA so that a flagman can be present.

4. English Electric Company's bid for disputed Item 21A was more than twice that of Westinghouse's bid, yet still 46% below the TA estimate. On another item, English Electric varied from the TA estimate by 57%. Among other particular items listed in the bid analysis, Westinghouse deviated by as much as 48% in one instance, and G.E., the high bidder, at its most extreme deviated by 44%.

estimates, and that the inflation factor (15%) that TA had employed had seriously deviated from the then-current economic climate of 5% inflation.

The engineer recommended the Contract be awarded to the apparent low bidder, Westinghouse, and on December 28, 1982, the TA, acting as agent for the MTA, awarded the Contract to Westinghouse.

### C. Filing and Approval of the Detailed Cost Breakdown

Westinghouse was required to submit a Detailed Estimate Breakdown ("DEB") within 30 days from the notice of award pursuant to Article 3.01 of the Contract. Westinghouse submitted a DEB 77 days after the Contract was awarded, on March 16, 1983. The Item 21A communications work portion of the DEB, prepared by Frank Caristia of MTEC, was consistent with the original Westinghouse bid in that it did not include cost estimates for installation of the remote cable connections and, for the same reason, the DEB was inconsistent with the scope of the work that TA intended to require through the telephone drawings.[5] Mr. Caristia states in preparing the DEB that he found the drawings governing this work to be illegible, unclear and inconsistent, but he did not request full-size drawings, seek clarification of the drawings, conduct a site survey, or report any inconsistencies to the TA.

The DEB for the disputed Item was received and reviewed by the TA and approved for payment by at least one official. At that time, the TA did not catch the missing items. A purchase order for the materials shown on the DEB for that item was approved on July 28, 1983 although the materials necessary to complete the disputed work were not included in the purchase order.

### D. The Disputed Remote Cable Work Resurfaces

Up to this point, Westinghouse and MTEC had performed no communications work on the Flatbush–Willoughby portion of the Contract. In late 1984 or in 1985, Caristia of MTEC for the first time reviewed full size bid drawings of the Flatbush–Willoughby communication work and conducted a site survey of the areas in which the disputed work was to be performed, in connection with the preparation by MTEC of the work drawings. As a result of his site survey, Caristia notified the TA that he had discovered that the existing remote cables were too deteriorated and of insufficient capacity to use. TA told MTEC that the Contract Drawings contemplated the installation of new cable to the remote destinations.[6] Russell Randazzo of MTEC orally advised Mr. Katz of the TA that MTEC had been intending only to splice into the existing wire, not to run new remote cables.

Thereafter, MTEC's performance ceased, it having prepared work drawings and purchased certain equipment materials. During Contract progress meetings in 1986 or 1987, Westinghouse indicated that the requirement to replace all the remote cable would result in its incurring substantially increased costs and balked at performing the work. After further discussions failed to produce a resolution, in the summer of 1987 Westinghouse was directed to perform the disputed work and to submit a formal claim under the Contract procedures if it believed it was entitled to additional monies.

---

**5.** More specifically, the detailed estimate for Item 21A did not include purchase of figure–8 cable, miles of which was to be installed to connect remote locations to the DeKalb passenger station, and to form a new circuit connected to the Flatbush–Willoughby power substation. The detailed estimate also included much more limited quantities of high capacity ("12 pair" and "25 pair") cable than was necessary to do the disputed work.

**6.** The TA engineer who had designed the drawings knew of the deteriorated condition of the existing cable when preparing his drawings. That the drawings seemed to call for installation of new remote cable also had been imagined by MTEC in the fall of 1982, when it had first reviewed the drawings prior to preparing its bid price. MTEC did not heed to that first reading of the drawings at that time, instead assuming that the drawings were "wrong" since normally it simply spliced into remote cables rather than replacing them.

Westinghouse still balked and on July 22, 1987, at another meeting addressing the emergency alarm systems, a Westinghouse representative proposed that instead of completing the disputed work, Westinghouse give a credit to TA permitting TA to go to another contractor for completion of the remote cable work. Westinghouse further indicated that if required to complete the work, it would request an additional work order under the Contract to cover its additional costs. Westinghouse's representative was again told by Mr. Katz of TA that the Contract required Westinghouse to do the work and if Westinghouse felt it had a claim for exceptional costs, it could submit one for consideration by the TA at the end of the Contract.

During the summer of 1987, Westinghouse resumed the communications work that its subcontractor MTEC had ceased doing in 1985, employing a different subcontractor, Forest Electronics. Written notice concerning the disputed communications work was submitted by Westinghouse to TA several months later on February 8, 1988. On May 26, 1988, Westinghouse made a formal submission to the TA's Chief Electrical Officer ("CEO") requesting additional compensation for the work pursuant to Chapter Four of the Contract (the "Request").

In the Request, Westinghouse stated that it had underbid the Contract by $1,097,450.50 because it had not known the scope of the work the TA intended to include in Addendum No. 4. Westinghouse contended it was entitled to reimbursement of that million dollar amount on several grounds: (a) reasonable bid mistake; (b) TA's "superior knowledge"; (c) TA's "snapping up" of its mistaken bid; and (d) TA's defective contract specifications. The Request was supplemented by an additional submission on July 14, 1988, addressing contract bar and laches problems.

On July 15, 1988, the CEO, who is identified in the Contract as arbiter of disputes arising thereunder, issued a one-page written determination rejecting Westinghouse's claim. After the Request denial, Westinghouse did not serve a Notice of Claim on TA or on the MTA nor seek to have the determination of the Chief Electrical Officer annulled in an Article 78 proceeding. In October of 1988, it commenced this lawsuit in federal court.

## ISSUES PRESENTED

On the following grounds, TA and MTA move for summary judgment against Westinghouse's claims for breach, equitable reformation, or declaration of rights under the contract:

1. Westinghouse's failure to seek prebid clarification in accordance with the Contract terms bars Westinghouse from claiming any benefit from the asserted ambiguity as to scope of work required by the Contract;

2. The law does not protect Westinghouse from its unilateral mistake, and there is no genuine issue as to fraud or overreaching on the part of TA or MTA;

3. The Contract's notice requirements and the doctrine of laches bar Westinghouse's late-filed claims;

4. The Contract's alternative dispute resolution procedures bar Westinghouse's action.

## STANDARDS APPLICABLE TO SUMMARY JUDGMENT MOTIONS

Summary judgment is authorized if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). Thus, TA and MTA, as the moving parties, bear the burden of proving that no genuine issue of material fact exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Corselli v. Coughlin*, 842 F.2d 23 (2d Cir.1988). All ambiguities are resolved against them, and all favorable inferences are drawn in favor of the party against whom summary judgment is sought. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989).

■ The Supreme Court has made clear that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *see also Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987). Summary judgment is permissible only in circumstances where "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

However, courts should not be reluctant to grant summary judgment in appropriate cases. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually insupportable claims," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986), thereby permitting courts to avoid "protracted, expensive and harassing trials." *Mieri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). Clearly a trial of the issues presented here would have those characteristics.

■ Under Rule 56(c), statements in affidavits not based on personal knowledge, *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir.1988), and arguments or statements by counsel unsupported by the record, *Beyah v. Coughlin*, 789 F.2d 986, 989–90 (2d Cir.1986), cannot raise a genuine issue of fact requiring a trial. Even disputed issues of fact do not require a trial where the issues are not material to the substantive claims and defenses being asserted. *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) (per curiam). Whether a particular factual dispute is material always depends on the applicable substantive law. *Anderson v. Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510; *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987) (citation omitted); *Uniroyal, Inc. v. Home Insurance Co.*, 707 F.Supp. 1368, 1373–73 (E.D.N.Y.1988) (Weinstein, J.).

## THE CONTRACT REQUIRED THAT THE PERCEIVED AMBIGUITY ABOUT THE SCOPE OF THE DISPUTED WORK BE RESOLVED BY PRE–BID CLARIFICATION

■ For purposes of the motion, the Contract is assumed not to have *unambiguously* specified the scope of remote cable work called for by the Contract.[7] Nevertheless, that the Contract documents were ambiguous as to the required scope of installation of the remote cable fails as a matter of law to support Westinghouse's claim that its unilateral pre-bid interpretation of the Addendum No. 4 drawings was one upon which it was entitled to rely.

Under the terms of the Contract Book, each prospective bidder is instructed to:

examine the Contract Documents carefully and submit in writing any requests for:

---

7. Both sides to the dispute have presented testimony by affidavit or deposition effectively demonstrating that the Contract could have more clearly indicated the intended scope of remote cable work called for. It is undisputed that the Specifications (which are narrative) did not mention this work, and just as evident that the Contract did not require that all work required by the Contract be set forth in the Specifications, in addition to Drawings. *See* §§ 2.3(d), 2.9. Westinghouse concedes that the Addendum Four Drawings do "mention" this work (3(g) Opposition ¶ 8), but its affiant Caristia contends the Drawings were "unclear" and "ambiguous." A TA deponent who prepared the drawings testified that the Drawings do tell the contractor to install new cable connecting to the remote loca-

tions, and provide stationing data sufficient to enable a contractor to estimate material quantities required for the work. (*See, e.g.,* 3(g) Opposition ¶ 123). The MTEC employee who at the time was in charge of finalizing the relevant portion of the bid states in his affidavit that "MTEC could not determine" from the Drawings whether installation of the remote cable was intended. However, in his deposition, he states that the MTEC estimator who conducted the actual review of the Drawings for him told him at that time the Drawings appeared to require "new remote cable to be installed" but in view of past contrary practices, MTEC concluded the TA Drawings were a mistake. Prekker Depo. at 50–30; *see also* 3(g) Opposition ¶ 127.

(a) an interpretation or correction of any ambiguity, inconsistency, or error therein.

(b) any substantive amendments which he desires to have made in the Contract Documents.

To be given consideration any such request must be in writing and must be received by the Authority at least ten (10) working days prior to the date designated for the opening of bids or such shorter period as the Authority in its sole discretion shall allow ...

... A bidder's failure to request a clarification, interpretation etc. will preclude such bidder from thereafter claiming any ambiguity, inconsistency, or error which should have been discovered by a reasonably prudent bidder.

Information for Bidders ¶ 8.

Westinghouse admits that its subcontractor MTEC found the Drawings to be "inconsistent," "unclear," and "ambiguous." (Prekker, who was involved in the MTEC bid preparation based upon review of the Drawings, stated at deposition that there were "a lot of discrepancies here," that Addendum 4 "was something very unclear to my estimator," who had detected "a big change here in the scope of the telephone work" when he read the Addendum. Prekker Depo at 19–20, 49, 55.) Thus, there is no question that Addendum 4 put the subcontractor and Westinghouse on notice of the need for further inquiry under ¶ 8 if they wished to avoid the possibility of resolution of the perceived inconsistencies and ambiguities in a fashion contrary to their understanding.

It is equally undisputed that Westinghouse and its subcontractor did not request a pre-bid clarification pursuant to ¶ 8. Westinghouse's subcontractor instead chose to "ignore" the remote cable work that its estimator had detected in the Addendum 4 Drawings, and prepared a bid estimate for the job on the assumption that the TA had made a "mistake" and did not truly intend to deviate from the way the work "has always been done" in the past. Prekker Depo. 50–53. Westinghouse then simply incorporated this bid prepared by MTEC into its bid proposal.

Under the express language of ¶ 8, Westinghouse is thus "precluded" from "claiming any ambiguity, inconsistency or error" in the Addendum 4 Drawings.[8] Under New York law, which the parties agreed would govern their relations under the Contract, such bid provisions are enforced. *See James H. Merritt Plumbing v. City of New York*, 55 A.D.2d 552, 390 N.Y.S.2d 65 (1st Dep't 1976), *app. dismissed*, 41 N.Y.2d 806, 396 N.Y.S.2d 1025, 364 N.E.2d 850 (1977) ("*Merritt Plumbing*"). In *Merritt Plumbing*, the court rejected the contractor's claim that its bid "mistake" was caused by ambiguity in the contract, in view of a contract clause requiring the bidder "to request the Commission in writing for an interpretation or correction of every patent ambiguity, inconsistency ... which should have been discovered by a reasonably prudent bidder." *Id.*, 55 A.D.2d 552, 390 N.Y.S.2d at 68. Having failed to seek clarification of a reasonably discoverable ambiguity, the bidder could not later complain about the Commission's reasonable (but unfavorable) interpretation of the contract terms. *Id.*[9]

---

**8.** There is no issue that the perceived ambiguity is one that would have escaped the eyes of ¶ 8's reasonably prudent bidder," and thus relieve the bidder from the obligation to make a written inquiry of clarification. As noted above, here the subcontractor did in fact perceive and discuss the ambiguities in the Drawings internally in the course of preparing its bid so cannot claim that the ambiguity or error was unreasonably hidden or undetectable.

**9.** Although it does not govern this dispute, the same principle applies under federal contract bidding law, when the bidding procedures explicitly instruct that perceived or plain ambigui-

ties must be taken up in advance of bid. *See Beacon Construction Co. v. United States*, 314 F.2d 501, 504, 161 Ct.Cl. 1 (1963):

The bidder who is on notice of an incipient problem, but neglects to solve it as he is directed to do by this form of contractual preventive-hygiene, cannot rely on the principle that ambiguities in contracts written by Government are held against the drafter [e.g., *Peter Kiewit Sons' Co. v. United States*, 109 Ct.Cl. 390, 418 (1947)].

*Cf. Blount Brothers Construction Co. v. United States*, 346 F.2d 962, 964, 171 Ct.Cl. 478 (1965) (contractors cannot be expected to "ferret out hidden ambiguities or errors in the bid doc-

For this reason, the motion does not require determination of whether MTEC's "interpretation of the contract documents in light of circumstances was reasonable," as Westinghouse urges. The substantive law applicable to this dispute provides that bidder-detected—but unclarified—ambiguities are resolved in favor of the bid-letting agency when it has adopted a measure of "contractual preventive-hygiene," so long as the agency's construction of the Contract requirements is not unreasonable.

The reasonableness of TA's reading of the Drawings is not challenged by Westinghouse, perhaps because of Section 2.3(d) of the Contract Specifications, which provides that:

should any discrepancy appear or any misunderstanding arise as to the import of anything contained in either [the contract specifications or the contract drawings], the explanation or decision of the Superintendent shall be final and conclusive and the Contractor shall be governed by the direction of the Superintendent as required by Chapter 8.

Article 8.01(b) of the Contract likewise specifies that the "Superintendent shall make all necessary explanations as to the making and intention of the specifications or contract drawings ..." Under the Contract, then, Westinghouse agreed to accept the decision of the TA's Superintendent as to the meaning of the Drawings. It therefore would bear a particularly heavy burden of demonstrating that the proffered explanation is an *un*reasonable one, and has not chosen to attempt to do so.

Instead, Westinghouse defends the equivalent reasonableness of its own interpretation of the Drawings, in hopes that the dispute is subject to the rule that:

[w]here the government draws specifications which are fairly susceptible of a certain construction and the contractor actually and reasonably so construes

them, justice and equity require that the construction should be adopted.

*Fehlhaber Corp. v. State of New York*, 63 Misc.2d 298, 312 N.Y.S.2d 123, 130 (N.Y. Ct.Cl.1970) (citing *Peter Kiewit*, 109 Ct.Cl. 390 (1947)), *aff'd*, 40 A.D.2d 881, 337 N.Y. S.2d 42. The *Peter Kiewit* holding relied upon in *Fehlhaber*, however, does not apply where, as here, the government has adopted the prophylaxis of a pre-bid clarification requirement and the bidder fails to adhere to that requirement despite the bidder's knowledge (as opposed to innocence) of the contractual ambiguity. *See Blount Brothers*, 346 F.2d at 964 (citing *Beacon Construction*). *See also James H. Merritt Plumbing v. City of New York*, 55 A.D.2d 552, 390 N.Y.S.2d 65 (1st Dep't 1976), *app. dismissed*, 41 N.Y.2d 806, 396 N.Y.S.2d 1025, 364 N.E.2d 850 (1977). In *Fehlhaber* and *Peter Kiewit*, no such rule of preventive-hygiene had been adopted by the bidding authorities.

Thus, even assuming the Contract's fair susceptibility to Westinghouse's interpretation of the scope of the remote cable work, the combined force of ¶ 8 of the Bidding Rules and MTEC's admitted uncertainty and ambiguity about the Drawings (arising from the tension between its knowledge of TA's past practices and its understanding that the Drawings marked "a big change here in the scope of the telephone work") deprives Westinghouse, as a matter of law, of the benefit of relying on the reasonableness of its own favorable view. Sound principles of bid contracting law required it to come forward, pre-bid, to seek clarification of the scope of work called for by the Contract, knowing it was ambiguous, rather than assume its own interpretation of an ambiguous provision would, after the fact, be resurrected in fairness as that which had been reasonably relied upon when the bidding estimates were being performed.[10]

uments" and are "protected if they innocently construe in their favor an ambiguity equally susceptible to another construction or overlook an error;" nevertheless, bidders are under "some duty to inquire about a major patent discrepancy, or obvious omission").

10. Westinghouse's position suffers from the further difficulty that under the parties' agreement and New York law, it was not reasonable for MTEC and Westinghouse to rely upon matters outside the Contract to color their construction of the contract requirements, as happened when MTEC concluded the Drawings "must be wrong" based on its understanding of past TA contracts.

## THE LATE ISSUANCE OF ADDENDUM 4 DID NOT WAIVE THE PRE–BID CLARIFICATION RULE

■ To avoid application of that rule, Westinghouse argues that the "contract clauses purporting to shift that risk [of contractual ambiguity] are conditioned upon an opportunity of the contractor to investigate the site of the work" which Westinghouse says it did not have, and, further, that a pre-bid clarification request would have been pointless under the provisions as time did not permit any official clarification prior to the bid date. In fact, the language of ¶ 8 mentions no site-visit condition, and the rule's purpose of encouraging resolution of perceived contractual ambiguities prior to bidding would be ill-served by imputing such a requirement in instances where a party perceives, but declines to bring to the TA's attention, the need for site investigation prior to bid submission.

That was the situation here, according to Westinghouse. It strenuously contends that an informed bid on the ambiguously-defined remote cable work could not properly be made without inspecting the FM substation and related tunnels. However, Westinghouse does not contend that prior to bidding it (or its subcontractor MTEC) ever sought to inspect the Flatbush–Willoughby substation and related tunnels that it now says was so necessary before to bidding. Assuming the truth of the proposition that the remote cable work could not be properly bid without information available from a site survey only serves to emphasize the need for an affirmative request by the bidder, pre-bid, for the opportunity to inspect the site of the remote work to examine its scope.[11] The fact that time was short—the Addendum was issued on November 4 and bids were due on November 16—does not explain why Westinghouse did not even request an inspection in the face of such uncertainty.

No more availing is Westinghouse's assertion that a request to clarify would have been pointless because of insufficient time. Under the Contract, it is true that a request for clarification ordinarily must be received ten or more working days prior to the date designated for the opening of bids. As the bid date was November 16 and the Addendum No. 4 was released only on November 4, contractors had just barely enough time to submit a request within that time period, assuming they promptly obtained the Addendum.[12] However, West-

---

The Contract specifically provided that the contract documents alone described the work:

The details of the work to be performed, apparatus, if any, to be furnished, the locations, dimensions and other characteristics of the Project are given in the Technical Specifications and Contract Drawings and it is those documents, and those documents only, which describe the work on the Project.

Information for Bidders ¶ 6(b). *See also* Article 10.04 (contract documents contain all terms agreed upon and "no other agreement, oral or otherwise, regarding the subject matter of this agreement shall be deemed to exist or to bind any of the parties hereto, or to vary any of the terms contained herein). *Cf. Able Breaking Corp. v. Consolidated Edison*, 116 A.D.2d 544, 497 N.Y.S.2d 397, 398 (2d Dep't 1986) (written contract cannot be contradicted by informal oral statements).

11. Westinghouse was made aware of that affirmative burden by ¶ 7 of the Information for Bidders, which sets forth that bidders are "conclusively presumed to have full knowledge of any and all conditions concerning the sites of the Project relating to or affecting in any way the performance of the work to be done under this contract which were discovered or should

have been discovered upon prudent inspection." ¶ 7(c). The same paragraph urges prospective bidders "to visit and fully acquaint themselves with the existing conditions at the sites of the proposed work" and instructs each to "inform himself" about "all matters which may in any way affect the work under this contract." ¶ 7(a). Although Westinghouse claims it was not "allowed" by the Transit Authority to conduct an inspection of the Flatbush–Willoughby site, a more careful reading of the affidavits and depositions discloses that Westinghouse and MTEC actually never requested the opportunity to inspect that site. The undisputed record is that it takes between two to seven days to arrange such a site inspection. Given that the Addendum was released on November 4, 1982, a prompt request for an inspection might well have permitted a site visit prior to the bid deadline of November 16, 1982. That cannot be known for certain because Westinghouse made no such request.

12. Westinghouse believes its subcontractor did not receive Addendum No. 4 until as late as November 10 *from Westinghouse.* However, a receipt of the TA's public record sales office for November 5, 1982 shows that that day, exactly

inghouse ignores that even if they did not, ¶ 8 in the alternative states that clarification requests may be considered on "such shorter period as the Authority in its sole discretion shall allow...." Thus, under the Contract, Westinghouse's determination not to bring the ambiguity to the attention of the TA prior to the bidding date, out of a belief that TA would not respond in time, unilaterally substituted its own discretion for that of the TA as to the significance of the ambiguous provision.

Under the bidding rules, it was this "failure to request a clarification" (and notably, not its failure to *receive* clarification) that contractually "precludes" Westinghouse from relying on any perceived ambiguity. Either a request for clarification or for a site survey at Flatbush–Willoughby might have alerted the TA to a lurking ambiguity. One cannot predict now what action such requests would have provoked, but a possible consequence, and a central reason for the contract rule, is to flush out disputed issues prior to bidding and avoid costly confusion engendered by them afterwards, of which this litigation is an instance.

Here, if the concerns raised were sufficiently significant to other bidders and the TA, a request might have resulted in issuance of a clarification, or assuming as Westinghouse contends that a clarification was impossible within the time available, perhaps a postponement of the bidding date.[13] If Westinghouse's request did not achieve either of those results, it was always entitled not to bid, if it believed the risks of "bidding in the dark" were too great. *See Able Breaking Corp.*, 116 A.D.2d 544, 497 N.Y.S.2d at 398 (where contract is "freely bid upon by plaintiff, ... there [is] not an absence of 'meaningful choice' on plaintiff's part") (citations omitted); *Cayuga Harvester, Inc. v. Allis–Chalmers*, 95 A.D.2d 5, 465 N.Y.S.2d 606, 617 (4th Dep't 1983). Obviously it did not think the risks were too great at the time, since it initiated none of the contractually-

available steps designed to alleviate (or, at least, insulate the bidder from the consequences of) ignorance and error.

For all these reasons, assuming the facts are as contended by Westinghouse, as a bidder it was obligated to submit a request for clarification prior to bid submission if it wished to avoid assuming the risk that the TA had a different but reasonable construction of Drawings it perceived to be ambiguous. Westinghouse failed to do so. As it has not sought to raise an issue of fact as to the fair susceptibility of the Drawings to the TA's construction (in view of MTEC's estimator's expressed view at the time of his initial reading of the Addendum Drawings that the Drawings implicated remote cable installation, that in any event is a task Westinghouse cannot surmount), as a matter of the applicable substantive law it is now bound to live by the TA's construction.

Summary judgment is therefore appropriate, notwithstanding authority cited by Westinghouse holding that trial is necessary where a contract term is susceptible of at least two fairly reasonable interpretations. *See Wards Company, Inc. v. Stamford Ridgeway Associates*, 761 F.2d 117, 120 (2d Cir.1985); *Consumer Power Co. v. Nuclear Fuel Services*, 509 F.Supp. 201, 207 (W.D.N.Y.1981); *America's Insurance Center v. Trade Winds Brokerage Limited*, 480 F.Supp. 222, 224 (S.D.N.Y.1979); *see also Schering Corp. v. The Home Insurance Corp.*, 712 F.2d 4, 9 (2d Cir.1987) (summary judgment "perforce improper" where clause in contract was susceptible to two reasonable interpretations). *Schering* and these other cited cases notably were rendered prior to *Celotex's* reminder that summary judgment is not "a disfavored procedural shortcut, but rather ... an integral part of the Federal Rules," *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Apex Oil Co. v. Di Mauro*, 822 F.2d 246, 252 (2d Cir.1987); *Abex Corp. v. Maryland Casu-*

---

one day after Addendum No. 4 was issued, the subcontractor itself came to its Jay Street sales office in Brooklyn and purchased copies of the Contract documents.

**13.** Whether postponement was a realistic possibility is uncertain, given that there were some

time limitations on available funding for the Contract. That postponement definitely could not occur was a unilateral assumption Westinghouse was entitled to make, however, at its own peril.

*alty Co.,* 790 F.2d 119 (D.C.Cir.1986). In Judge Weinstein's appraisal, the rule of *Schering* noted above has since then "been limited to its one unassailable proposition, that summary judgment on an ambiguous insurance policy should not be granted while discovery is still incomplete." *Uniroyal, Inc. v. Home Insurance Co.,* 707 F.Supp. 1368, 1374 (E.D.N.Y.1988).

Even if *Schering* retains more vitality than that, it does not control the present case. Neither *Schering* or any of the cases cited by Westinghouse as disfavoring summary judgement of contracts containing ambiguous terms involved the interpretation of a public works contract that contains its own prophylactic rules of construction. The contract here in question contains such rules, recognized as enforceable as a matter of New York substantive law. *See Merritt Plumbing,* 55 A.D.2d 552, 390 N.Y.S.2d 65, *app. dismissed,* 41 N.Y.2d 806, 396 N.Y.S.2d 1025, 364 N.E.2d 850 (1977). Those rules dictate that terms perceived as ambiguous *ex ante* by a bidder must be brought to the attention of the non-bidding party, at risk of precluding the bidding party's reasonable interpretation of the term, and privileging the construction of the term offered by the non-bidding party. No factual issue presented by Westinghouse prevents application of that substantive law governing the proper construction of a perceived, but unclarified ambiguity in public works contract to the present dispute. *Cf., Uniroyal, Inc. v. Home Insurance Co.,* 707 F.Supp. 1368 (E.D.N.Y.1988) (summary judgment properly granted despite ambiguity in insurance contract term in view of applicability of substantive rule of New York insurance law that permitted insurer's favored construction of term to be adopted only where it was sole interpretation that could fairly be placed upon the term).

WESTINGHOUSE'S THEORIES OF MUTUAL MISTAKE, FRAUDULENT INDUCEMENT, UNILATERAL MISTAKE/UNCONSCIONABILITY CANNOT SUPPORT A CLAIM OF CONTRACT REFORMATION

■ New York law provides for reformation of a contract where the parties to it were mutually mistaken as to its actual terms, *see Simons v. Crowley,* 112 N.Y. S.2d 851 (Sup.Ct.1952), or where one party was mistaken as to the contract's requirements owing to the fraud or fraudulent concealment of the other party, *Brandwein v. Provident Mutual Life Insurance Co.,* 3 N.Y.2d 491, 496, 168 N.Y.S.2d 964, 967, 146 N.E.2d 693, 695 (1957); *Chimart Associates v. Paul,* 66 N.Y.2d 570, 573, 498 N.Y. S.2d 344, 347, 489 N.E.2d 231, 234 (1986). In opposition to the summary judgment motion, Westinghouse argues there is considerable evidence supporting reformation under either the mutual mistake theory or some equitable variation of fraudulent concealment.

### A. *Mutual Mistake*

■ Mutual mistake requires that the same contractual term be misunderstood by both parties. There is no disputed factual issue that such was so here. Westinghouse admittedly did not include the cost of disputed remote communications work in its bid, and for purposes of its mutual mistake theory, Westinghouse apparently concedes that this omission resulted from its mistaken reading of the Drawings, which objectively required such work to be performed. Westinghouse's lawyers contend as well that TA also misunderstood the scope of its Drawings, but they offer no evidence that converts that contention into a genuine issue of fact.

The proffer of a TA memorandum written in August 1981 in which a Power Department official stated that the work then being proposed by the Signal Department for inclusion in the Contract was too expensive and beyond the customary sphere of Power Department contracts does not raise a factual issue, since that document does not establish the TA's intent more than a year later, in November 1982, when it issued the Addendum 4 Drawings that called for the performance of remote communications work. Review of the record testimony of the engineer who designed those Drawings in 1982 for issuance with the TA

Contract indicates he prepared the Drawings with the purpose and understanding that remote cable would be installed, and the same is manifestly evident from the pre-bid cost estimate of $1.8 million prepared by the TA for the lump-sum Item which included the remote work. Nothing submitted by Westinghouse counters this direct evidence of the TA's intention at the time of the bid contracting to have the remote work performed, including actions by TA subsequent to the bid award approving of the Westinghouse's detailed cost estimate for the work and the associated purchase order. The mutual mistake theory of Westinghouse therefore cannot forestall summary judgment, since it rests not on material disputed facts, but rather a fanciful inference drawn from undisputed events.

### B. *Fraudulent Concealment/Snapping Up Induced Mistake*

■ Westinghouse's unilateral mistake theory is no more successful. Without legally sufficient evidence of fraud or fraudulent concealment, unilateral mistake ordinarily cannot support a claim for reformation of contract. *Barclay Arms, Inc. v. Barclay Arms Associates*, 74 N.Y.2d 644, 646, 542 N.Y.S.2d 512, 513–514, 540 N.E.2d 707, 708–09 (1989). As a form of equitable relief, New York contract reformation rules require that reformation be justified by substantial and convincing evidence. *Sutton Hill Associates v. Landes*, 705 F.Supp. 940, 948–949 (S.D.N.Y.1989) (noting that heightened burden of proof governing claim for reformation is factor relevant to court deciding summary judgment motion); *Seebold v. Halmar Construction Corp.*, 146 A.D.2d 886, 536 N.Y.S.2d 871, 872 (3d Dep't 1989) ("clear and convincing" evidence); *South Fork Broadcasting Corp. v. Fenton*, 141 A.D.2d 312, 528 N.Y.S.2d 837, 839 (1st Dep't), *app. dismissed*, 73 N.Y.2d 809, 537 N.Y.S.2d 494, 534 N.E.2d 332 (1988) (requiring proof "in no uncertain terms").

The parties agree that a prima facie case of fraudulent concealment (which Westinghouse also terms a "superior knowledge" or a "snapping up" claim) is established by facts showing one party to a contract knew of some material fact at or prior to the time the contract was awarded, but concealed that fact from the other party in order to take advantage of the other party. *Barclay Arms*, 74 N.Y.2d at 647, 542 N.Y.S.2d at 514, 540 N.E.2d at 709; *Kadish Pharmacy v. Blue Cross and Blue Shield*, 114 A.D.2d 439, 494 N.Y.S.2d 354, 355 (2d Dep't 1985), *app. dismissed*, 68 N.Y.2d 641, 505 N.Y.S.2d 72, 496 N.E.2d 231 (1986). Westinghouse fails to proffer facts satisfying those standards.

■ Its first theory is that prior to the bid date, TA knowingly concealed from bidders the scope of the remote cable installation called for by the Drawings. To support that contention, it states that the Drawings were prepared in August 1982 but withheld by the TA until November 4, 1982. Despite the completion of discovery, however, Westinghouse does not offer any evidence that the Drawings were withheld during this period for the purpose of deceiving bidders or concealing the disputed work. More tellingly, although it asserts that by this delay TA "effectively withheld the information altogether," *cf. County Asphalt, Inc. v. State*, 40 A.D.2d 26, 337 N.Y.S.2d 415, 420–21 (3d Dep't 1972) (State made "misrepresentations" and omitted altogether unit item "with full knowledge . . . material would be required"), Westinghouse does not deny that the Drawings actually were issued as an express addendum to the Contract 12 days before bid submission, that Westinghouse and its subcontractor received the Addendum prior to bid submission, that its subcontractor for the work in question was not deceived but when reviewing the Drawings in fact "spotted this new remote cable to be installed" (Prekker Depo. at 110), and that despite the questions the Drawings inspired internally as to the intended scope of the work, Westinghouse and the subcontractor sought no clarification from TA.

On this record, Westinghouse's "evidence" of fraudulent concealment is far "too uncertain and conclusory to defeat summary judgment." *Chimart Associates v. Paul*, 66 N.Y.2d 570, 575, 498 N.Y.S.2d

344, 348, 489 N.E.2d 231, 235 (1986) (rejecting claim that defendant misrepresented agreement's content and effect); *see also John Hancock Mutual Life Insurance Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 671 (2d Cir.1983) (burden not satisfied where plaintiff, who contended interpretation of mortgage clause had been concealed from it, should have been aware of clause's meaning from reading mortgage); *Kadish Pharmacy*, 114 A.D.2d 439, 494 N.Y.S.2d at 355 (dismissing reformation claim where plaintiff submitted only "bald conclusory statements concerning any fraud"). The proffered testimony and exhibits here fail to make out a case for actual, intended, or effective concealment on the part of TA.

■ The second theory of concealment contends that even if TA did not conceal the remote cable work requirement, the TA nevertheless "snapped up" Westinghouse's low bid knowing that it was predicated upon a mistaken interpretation of the Contract. Westinghouse relies upon federal contracting law, *Bromley Contracting Co., Inc. v. United States*, 596 F.2d 448, 219 Ct.Cl. 517 (1979), for legal support:

> The remedy [of reformation] has been extended from its traditional area of application—mutual mistake by the parties—to include cases where the Government knew or should have known of a mistake in a bid costly to a bidder ... [W]hat we are really concerned with is the overreaching of a contractor by a contracting officer when the latter has knowledge, actual or imputed as something he ought to know, that the bid is based on or embodies a disastrous mistake and accepts the bid in the face of that knowledge.

*Id.*, 596 F.2d at 454 (citations and quotations of federal cases omitted).

No New York court has held, however, that imputed, as opposed to actual knowledge, of a bidder's mistake suffices to reform a contract, nor is it the law in New York that just any sort of unilateral mistake is subject to reformation provided the bidding authority possessed actual knowledge of it early on. As to the first question of constructive knowledge, the broad *Bromley* language quoted above recently was cited with apparent approval in a decision of the New York State Supreme Court of Wayne County, *Iversen Construction Corp. v. Palmyra–Macedon Central School District*, 143 Misc.2d 36, 539 N.Y.S.2d 858, 861 (1989), but the actual holding in *Iversen* was far more restrained. After noting *Bromley's* "knew or should have known" standard, the court hastened to add that "[h]ere it is undisputed that the School District knew of the mistaken bid submitted by Iversen before the awarding of the contract to Iversen at the erroneous bide amount." *Id.*, 539 N.Y.S.2d at 860, 861 (further noting that "[t]he School District [here] was, of course, aware almost immediately of the alleged error made by iversen."). *Iversen* also relies upon *Derouin's Plumbing and Heating, Inc. v. Brighton Sewer District No. 2*, 71 A.D.2d 822, 419 N.Y.S.2d 390 (4th Dep't 1979), in which the *Iversen* court observed, "the municipality was aware of the mistake three weeks prior to awarding the contract." 539 N.Y.S.2d at 860.[14] Thus, regardless of the *Bromley* dicta, it is clear enough that the *Iversen* court did not determine that reformation of a bid-contract is available under New York law under circumstances where the public authority has not been shown to have had actual knowledge of the bidder's error.

*Iversen* and *Derouin's* also concerned a different sort of bidding mistakes than at issue here: those that are "clearly a clerical-arithmetical error of the type which our courts have found as justifying the granting of equitable relief in the nature of rescission or reformation." *Iversen*, 539 N.Y.S.2d at 860 (citing cases). In *Iversen*, the contractor mistakenly failed to include one entire sheet of subcontractor bids in

---

**14.** *Iversen* further quotes with approval a passage from a treatise stating "It can hardly be a substantial impairment of the system of public bidding developed by experience and the usual in public contracts to grant such relief where a bona fide mistake is proven *and was known to the municipality before acceptance or any loss to it....*" 539 N.Y.S.2d at 861 (quoting *McQuillin Mun. Corp.* (cum. supp. Section 29.82) (emphasis added).

computing his total bid and, that same day, upon discovering the clerical error, "immediately sought withdrawal of its bid because of the obvious inadvertent error." *Id.* at 860. The *Derouin's* contractor similarly "made a clerical error in transposing the total amount of his bid form the recapitulation sheets to the bid proposal sheet" which quickly came to the municipality's attention. *Derouin's,* quoted in *Iversen, id.,* 539 N.Y.S.2d at 860.[15]

Thus, the present state of New York law on the subject, as exemplified in *Iversen* and *Derouin's,* holds forth the possibility of bid reformation where the bidding authority is shown to have had actual knowledge of a bidder's inadvertent and clerically-inspired arithmetic error prior to making a contract award, yet nevertheless snapped up the bid. Westinghouse has not introduced facts supported by affidavit or otherwise that come close to satisfying that limited standard of reformation, the contours of which appear to be supported by sound principles of public policy.[16]

First, it submits no evidence that the TA had *actual* knowledge prior to awarding it the bid or even for two years after that a mistake (of whatever nature) had been made by Westinghouse and it is undisputed that, unlike the contractor in *Iversen,* Westinghouse itself provided no notice of mistake prior to the award. Thus, "there is no showing of any actual knowledge" or bad faith on TA's part. *Wender Presses, Inc. v. United States,* 343 F.2d 961, 962, 170 Ct.Cl. 483 (1965).

If New York law permitted reformation of a competitively bid contract upon a showing of constructive knowledge, the facts presented by Westinghouse might well raise a question whether TA should have known of Westinghouse's mistake at the time of the award, although the evidence might not be sufficiently "substantial and convincing" to warrant reformation. The TA's constructive knowledge would be based upon the substantial gap between the TA estimate for Item 21A and the Westinghouse bid, Item 21A was, however, only one of numerous components of a $20-plus million contract and Westinghouse's overall bid was sufficiently consistent with the engineer's estimate and the other contractors' bids so as to raise no particular suspicion that the remote cable work had been omitted from the entire bid. However, examination by TA of the deviation as to bids on Item 21A, when combined with the TA's awareness of the timing of the release of Addendum No. 4, the lack of site visit requests to Flatbush–Willoughby, and the prior practice of contracting for such work through the Signal Department, suggests at least the possibility that TA ought have imputed to it some knowledge of Westinghouse's mistake.

That possibility is further heightened by the TA's approval, post-award, of the detailed cost breakdown and purchase order submitted by Westinghouse in 1983, which concededly did not include the costs of the remote cable installation. As a matter of

---

**15.** In other cases, where relief has been granted for substantive errors, it has not been awarded in the form of reformation here several years after award and performance, as Westinghouse seeks. *See, e.g., Balaban–Gordon v. Brighton Sewer Dist.,* 41 A.D.2d 246, 342 N.Y.S.2d 435, 440 (4th Dep't 1973) (permitting bid withdrawal, not rescission or reformation, prior to owner's award where court found no meeting of minds as to scope of work).

**16.** In New York, public works officials are charged with protecting the public interest in getting the highest quality work at the lowest possible price. *Matter of Fischbach and Moore, Inc.,* 79 A.D.2d 14, 435 N.Y.S.2d 984, 986 (2d · Dep't), *app. denied,* 53 N.Y.2d 604, 439 N.Y.S.2d 1028, 422 N.E.2d 583 (1981); *see also Conduit and Foundation Corp. v. Metropolitan Transportation Authority,* 66 N.Y.2d 144, 149, 495 N.Y.

S.2d 340, 344, 485 N.E.2d 1005, 1009 (1985) (public has interest in the economical use of public moneys). Pursuant to this public policy, the Authority "has no independent responsibility to guard the interests of those bidders who are eager to achieve the maximum profit from public contracts." *Matter of Fischbach and Moore,* 79 A.D.2d 14, 435 N.Y.S.2d at 987. The present legal approach lays emphasis upon avoiding such mistakes that arise from ambiguous provisions—and the litigation they spawn— by creating a strong incentive for bidders to seek clarification of provisions that appear to them to be unclear. A "should have known" standard, by contrast, may make uncertainty profitable for bidders and inspire litigation over a public bidding authority's care in reviewing bids.

the law of the Contract, approval by the TA of those submissions (the purpose of which is to plan progress payments) could not effect a modification of the Contract terms. *See* Bidding Instructions ¶ 8; Article §§ 2.3(d), 2.9 (governing procedures for clarification of contract requirements). However, the fact of such approval, combined with the additional facts noted above, does create a genuine issue of fact as to TA's constructive knowledge, which under federal law bears on the availability of equitable reformation.

For the reasons previously noted, that factual issue is not a material one here because New York law, at least at present, does not recognize reformation premised upon constructive knowledge. Even if New York law did, the undisputed record shows that Westinghouse's "mistake" is not of the clerical-arithmetic sort that New York courts have recognized as entitling a bidder to contract reformation. That form of inadvertent error, unlike mistakes arising from a *perceived* ambiguity in the scope of work called for under a contract drawing or specification, by nature cannot be clarified *ex ante* by making inquiries to the bidding authority. Pre-performance correction of the clerical error merely restores the bid to its intended numerical dimension, and in no way alters the bidder's considered valuation of the cost of the work to be performed. Not so with bidding "errors" that result from conditions of subjective or objective contractual uncertainty that are recognized but go unclarified prior to bid submission. Westinghouse cites no New York case favoring reformation of that substantive, as opposed to the clerical, form of mistake, upon a showing of less than actual knowledge or concealment, where the contract required the bidder to seek clarification of such ambiguities. The only case cited that is similar as to error is *Balaban–Gordon Co. v. Bright Sewer District*, 41 A.D.2d 246, 342 N.Y. S.2d 435 (4th Dep't 1973), but there, the contractor who made that negligent substantive error in bid was permitted only to *withdraw* —not reform—the bid, since the contractor had provided prompt actual notice of bid mistake and the owner at time of

receiving notice had not yet awarded the contract. As shown in greater detail below, *Balaban–Gordon* does not support Westinghouse's claims.

### C. Unconscionability and Ordinary Care

 Finally, Westinghouse contends that regardless of the state of TA's knowledge of bid mistakes, New York law provides forgiveness when (a) the bidder's mistake is material, (b) occurred despite the exercise of ordinary care by the bidder, (c) enforcement of the mistake would be unconscionable; and (d) reformation would place the bidding authority in *status quo*. *Balaban–Gordon Co. v. Brighton Sewer District No. 2*, 342 N.Y.S.2d 435, 437. Westinghouse's reliance on the doctrine of *Balaban–Gordon* is misplaced for several reasons.

First, accepting that the mistake here was material, the applicable contract rules governing the parties forbid Westinghouse's error from being considered as the result of the "exercise of ordinary care by the bidder." Westinghouse contends through deposition testimony and affidavit that the ambiguity in the Drawings made it impossible for it to bid properly from the Drawings alone, yet it nevertheless did not ask for any of the further information that, by its own account, was required by acceptable bid formation standards, and, as well, called for by the clarification requirement of the Contract. Furthermore, Westinghouse witnesses testify that in the face of ambiguous indications of a change in TA's scope of work practices for Power Contracts, they did not seek further instruction from TA as to the intended scope of work but rather assumed that the TA's past practices would continue to govern and that the current Drawings were mistaken, despite Contract rules specifying that the contract was the sole source of work obligations.

Under those operative and undisputed facts, Westinghouse hardly can be said to have established a *prima facie* case of reasonable care. *See Merryman v. Gottlieb*, 99 A.D.2d 893, 472 N.Y.S.2d 488, 490

(3d Dep't 1984) (citing 21 N.Y.Jur.2d *Contracts* § 121, p. 529) (equitable relief not afforded to escape "from a situation which was, to a large extent, of their own making"); *DaSilva v. Musso,* 53 N.Y.2d 543, 551, 444 N.Y.S.2d 50, 54, 428 N.E.2d 382, 385 (1981) (quoting *Grymes v. Sanders,* 93 U.S. 55, 61, 23 L.Ed. 798 (1876)) (" 'Mistake, to be available in equity, must not have arisen from negligence, where the means of knowledge were easily accessible.' "); *Albert Elia Building Co., Inc. v. American Sterilizer Co.,* 622 F.2d 655, 657 (2d Cir.1980) (quoting *Restatement of Contracts* (tent. draft n. 10) § 296) (" 'A party bears the risk of a mistake when ... he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake related, but treats his limited knowledge as sufficient' ").

In *Balaban,* the court appears to have ignored its own test, since it there found the bidder's mistake was a product of negligence. 342 N.Y.S.2d at 437–439. The reason that the "ordinary care" factor could be more lightly disregarded there than here is that in *Balaban,* no contract award had yet been made at the time the bidder's negligence came to surface. Here, by contrast, the undisputed facts show that it is not remotely possible to return to the status quo ante, a further factor weighing strongly against equitable relief.

The Contract was awarded to Westinghouse some eight years ago based upon its competitive bid at the time. The disputed work can not now be bid under the economic conditions that existed in 1982, when the TA chose Westinghouse as apparent low bidder in the stead of two others, who also came in considerably below engineering estimates on most of the Items. The work that Westinghouse has performed and the prices it was paid on all of the other undisputed portions of the project (most of

which too were bid well below engineering estimates, but not in each case bid by Westinghouse at levels lower than its competitors) likewise cannot be undone.

The situation is therefore wholly unlike that in *Balaban–Gordon,* where the owner, who had received prompt pre-award notice of the low-bidder's mistake, could simply rebid the job, 41 A.D.2d 246, 342 N.Y.S.2d at 438, and unlike the other cases cited by Westinghouse, not one of which support granting contract reformation post-award absent notice of mistake received by the granting agency prior to such award. *See Iversen,* 539 N.Y.S.2d at 859 (notice of mistake received prior to award and performance); *Levine v. Parsons,* 258 A.D. 1003, 16 N.Y.S.2d 722, 723 (3d Dept 1940) (bid rescinded where owner received actual notice before bid was accepted); *People v. John W. Rouse Construction Corp.,* 26 A.D.2d 405, 274 N.Y.S.2d 981, 983 (3d Dep't 1966) (owner received actual notice before awarding contract to mistaken contractor and so simply awarded contract to next highest bidder).

For all of the above reasons, equitable reformation of contract is unavailable on the undisputed facts to Westinghouse as a matter of law, whether under a theory of mutual mistake, fraudulent inducement, guilty knowledge, or unconscionability.

### CONTRACTUAL WAIVER OF CLAIMS AND LACHES

■ The Contract contains two provisions requiring prompt and written notice of claims being asserted by the contractor. Article 3.09 governs claims against the TA for damages, of any form, and requires that the contractor give TA written notice within 60 days of the occurrence of the act of TA upon which the claim is based, or be subject to waiver of such claim.[17] Article

---

**17.** Article 3.09 states:

if the Contractor claims compensation for any damage sustained by reason of any act, neglect, fault or default of the ... Authority ..., or compensation or payment arising under the Contract, he shall furnish a written statement to the Superintendent of the nature of the damage sustained or compensation or

payment due not more than 60 days from the occurrence upon which the claim is based. Such statement shall state the Contractor's position and be supported by relevant documentation.

The Contractor shall be deemed to have waived any claim not submitted in accordance with this Article.

4.03(c) governs claims by a contractor for additional compensation for work the contractor claims was not required by the Contract ("Extra Work"). The provision provides that a contractor must give written notice to the Authority within five days of being required to perform work that it deems to be work that is not required by the Contract. Failure to give such notice is deemed to be a waiver of any subsequent claim by the Contractor for additional compensation or damages arising from such work.[18]

Westinghouse did not comply with either Article 3.09 or Article 4.03(c). The first written notice specifically addressing the contractually-required scope of the disputed communications work was sent by Westinghouse to TA on February 8, 1988, which notice was followed by a formal "Request for Additional Compensation" submitted on May 26, 1988, detailing Westinghouse's claims. It is a matter of record that well before then, in late 1984 or early in 1985, Westinghouse's subcontractor became aware that "the main remote cables into which we had planned to splice connections to the individual emergency alarms, were too deteriorated to use" and was told at that time that "the Transit Authority had intended for those cables to be replaced under the contract." Caristia Aff. ¶¶ 12, 13.

The sixty days' notice period of Article 3.09 began running at that time, since Westinghouse knew no later than then that the bid was based upon an evaluation of the work required that varied from the TA's understanding of contract requirements. Despite this affirmative knowledge, at no time in 1985, 1986 or 1987 did Westinghouse submit a written notice of claim for damages by reason of TA's faulty specifications or concealment of contract requirements, as was ultimately set forth in its May, 1988 Request for Additional Compensation.[19]

Westinghouse also failed to give proper notice under Article 4.03(c) of its Extra Work claim. It is agreed that on June 26, 1987, Mr. Katz of the TA ordered that Westinghouse perform the disputed work. 3(g) Opposition ¶ 64. Under the terms of the Article, if Westinghouse wished to preserve its contention that this work was beyond the scope of work required by the Contract, it was required to give written notice within five days to the Superintendent setting forth why it deemed the dis-

---

18. The full text of the Article is as follows: (C) No Extra Work shall be performed except pursuant to written orders of the Superintendent expressly and unmistakably indicating his intention to treat the work described therein as Extra Work. In the absence of such an order, if the Superintendent shall direct, order or require any work, whether orally or in writing, which the Contractor deems to be Extra Work, the Contractor shall nevertheless comply therewith, but shall within five days give written notice to the Superintendent stating why he deems it to be Extra Work.... [T]he failure of the Contractor in timely fashion to serve such notice shall be deemed to be a conclusive and binding determination on his part that the direction, order or requirements of the Superintendent does not involve the performance of Extra Work, and shall be deemed to be a waiver by the Contractor of all claims for additional compensation or damages by reason thereof. The provision of the Contract relating generally to the Work and its performance shall apply without exception to any Extra Work required and to the performance thereof, except as may be otherwise provided by written agreement between the Contractor and the Authority.

19. MTEC's 1985 conversations with the TA in which it revealed its awareness that the existing cable was unusable obviously do not constitute notification of a "claim" for damages or further compensation, since MTEC did not contend at that time either that the work was not required under the Contract or that TA had caused the bid error by concealing or negligently specifying the scope of work called for under the Contract. Assuming that at project meetings held in 1986 and 1987 (apparently well more than the requisite sixty days after the MTEC discovery of error), Westinghouse alerted TA personnel to its contrary view of the scope of work called for by the Contract and of its belief *that the problem was in any event the fault of TA* owing to its unclear specifications of work in the contract documents (even that much is not clear from the 3(g) Opposition, ¶ 64), such notice would not have been timely, and would have failed to comply with the requirements of Article 3.09 that notice be in writing, be directed to the Superintendent, and be supported by relevant documentation. The fact that TA had written minutes prepared of those meetings does not cure any of those defects.

puted work to be Extra Work entitling Westinghouse to additional compensation. Failure to do so is contractually "deemed a conclusive and binding determination on [the Contractor's] part that the direction, order or requirements of the Superintendent does not involve the performance of Extra Work," and "a waiver by the Contractor of all claims for additional compensation or damages by reason thereof." Westinghouse did not file such a notice within five days. It waited to do so until several months after the cable installation work had resumed in the summer of 1987, filing a letter in February 8, 1988 and then its formal Request for Additional Compensation in May 1988.

New York case law recognizes that prompt, written notice requirements in public works contracts serve salutary purposes, *Naclerio Contracting v. Environmental Protection Administration*, 113 A.D.2d 707, 493 N.Y.S.2d 159 (1st Dep't), *app. dismissed*, 66 N.Y.2d 915, 498 N.Y.S.2d 1027, 489 N.E.2d 773 (1985) (permitting public authorities to take early steps to avoid or mitigate damages and engage in contemporaneous record keeping), and merit strict enforcement. *Id.*, 493 N.Y.S.2d at 161 (absent "strict compliance" with written disputed work notice provision, "claims relating thereto are explicitly waived"); *Buckley & Co. v. City of New York*, 121 A.D.2d 933, 505 N.Y.S.2d 140 (1st Dep't 1986) (waiver where no compliance with City contract's daily record-keeping requirement). Although failure to give notice compliant in every technical respect has been excused on occasion, *see Whit-*

*myer Brothers, Inc. v. State of New York*, 63 A.D.2d 103, 406 N.Y.S.2d 617 (3rd Dep't 1978); *Amadeus, Inc. v. State of New York*, 36 A.D.2d 873, 320 N.Y.S.2d 677 (3rd Dep't 1971), in such cases there is an extensive record of timely written correspondence between the contractor and agency addressing the disputed subject matter.

■ In view of this case law and the express contractual requirements, Westinghouse's three year delay in giving notice of under Article 3.09 bars it from maintaining its damages or equitable reformation claims founded upon fraudulent concealment or faulty specifications discovered in 1985.[20] Whether Article 4.03(c) should be enforced to bar the compensation claim for Extra Work is a more difficult question, given TA's purported waiver of its five-day notice requirement at the time the order to proceed with the disputed work was given.

The factual predicate of the waiver argument is that Mr. Katz of the TA told Westinghouse, after ordering that it complete the disputed work, that the contractor could submit a claim at the end of the job if it believed it was entitled to additional money for extra work. 3(g) Opposition ¶ 64.[21] Mr. Katz was at that time the site engineer who had been designated by TA as in charge of the technical aspects of contract drawings and specifications.

According to TA, Westinghouse should have known that Katz was authorized to give the order requiring Westinghouse to complete the disputed work, but not authorized to alter the contract terms governing

---

**20.** The unexcused three year period of delay between discovery of the bid mistake and the filing of the claim (which followed the two to three years during which the problem lay latent after its original, but unreexamined, identification by Westinghouse's subcontractor prior to bidding) also implicates the equitable doctrine of laches, provided TA suffered prejudice from that post-discovery delay. *See Airco Alloys Division v. Niagara Mohawk Power*, 76 A.D.2d 68, 430 N.Y.S.2d 179, 187 (4th Dep't 1980). Although TA may have suffered some prejudice from the delay between 1985 and 1988, the uncontradicted evidence does not permit a conclusive ruling here that TA was prejudiced to a degree sufficient to invoke laches as equitable bar.

**21.** There is some dispute as to whether Westinghouse was advised to submit a claim now if it wanted to dispute the work order, which claim would be resolved at the end of the job—an instruction consistent with Article 4 notice—or told to submit a claim at the end of the job, advise which would have conflicted with the 5 day notice requirement. The latter version urged by Westinghouse is assumed true for present purposes. *Cf.*, Exs. 21, 22 (minutes of meetings indicating Westinghouse was advised by TA that if it feels exceptional costs are involved, it "should enter a claim ... to be considered at the end of the job").

notice and submission of claims for extra work. That argument is less than persuasive. More reasonable and telling is that the purported waiver, even if given by one occupying a position of presumably sufficient authority, was not reduced to a signed writing.

Article 4.01, entitled *No Oral Changes*, is the first section of the rather short Fourth Chapter of the Contract, which is devoted to the subjects of Extra Work and Amplification of Contract Drawings. Given that those were topics which engaged the attention of TA and Westinghouse at that time of the 1987 meetings concerning the dispute remote communications work, it is not unreasonable to expect a sophisticated party such as Westinghouse to have familiarized itself with that term of contract, which contains the standard language that no modification of the contract is valid or enforceable "unless it is in writing and signed by the party to be charged therewith." Similarly, it could be expected to have reviewed the adjacent claim-waiver provision of 4.03(c) on the same Contract page, which deems claims for Extra Work extinguished if not asserted in writing five days from the time of a disputed work order. As a matter of law, of course, Westinghouse cannot claim it was ignorant of these provisions.

Thus, if Westinghouse did not know that Katz was not authorized to waive the five-day claim requirement, at least it was charged with knowing of, or obliged to suffer the consequences of its ignorance of, the 5–day rule's significance to its current situation, and the companion rule that relief from the 5–day period could legally be obtained only in writing.[22] Having failed to observe that requirement, Westinghouse as a matter of law cannot firmly establish that TA intended to waive its right to timely notice under Article 4.03(c), and "waiver should not be lightly presumed." *Gilbert Frank Corp. v. Federal Insurance Co.*, 70 N.Y.2d 966, 970, 525

N.Y.S.2d 793, 795, 520 N.E.2d 512, 514 (1988); *see also East 56th Plaza, Inc. v. Abrams*, 91 A.D.2d 1129, 458 N.Y.S.2d 953, 955 (3d Dept.1983) (intent to waive contractual right cannot be inferred from a doubtful act); *Liberty Mutual Insurance Co. v. Lodha*, 131 Misc.2d 670, 500 N.Y.S.2d 989, 991 (N.Y.Sup.1986) (intention to waive must be clear and unambiguous). Accordingly Westinghouse was bound by the timely notice requirement, its non-compliance with which bars its claim for additional compensation for the disputed work under the Extra Work provisions of the Contract.

## ADR REQUIREMENTS OF THE CONTRACT

As an alternative ground for granting summary judgment, TA urges conclusive effect be given to the Chief Electrical Officer's one-page ruling of July 16, 1989 denying Westinghouse's claims. Westinghouse submitted those claims to the TA in the form of a Request for Additional Compensation, which was reviewed and denied by the Chief Electrical Officer ("CEO") of the TA pursuant to Article 8.03 of the Contract.

Broad language in Article 8.03 authorizes the CEO to determine "all questions of any nature" arising out of the contract, "including claims in the nature of breach of contract or frau or misrepresentation before or subsequent to acceptance of the Contractor's Proposal. The provisions of that article further provide that such officer's determinations be binding upon the parties unless found by a court to be arbitrary and capricious. TA therefore contends that the Westinghouse action should be dismissed since, on undisputed facts, the CEO's opinion is not reversible by a court applying that latitudinous standard.

Ordinarily under New York law, "parties to an agreement may not seek a declaration of their contract rights when their agreement specifies a different, rea-

---

**22.** The purpose of requiring a signed writing is to avoid the sort of confusion so often resulting from indefinite memories, indeterminate talk, and unfocused assumptions. Observance of that requirement here might well have alleviated the parties' uncertainty about relatively simply matters such as whether Mr. Katz actually was a person authorized to sign a contract modification and whether he even meant to authorize one.

sonable means for resolving such disputes." *Kalisch–Jarcho, Inc. v. City of New York,* 72 N.Y.2d 727, 732, 536 N.Y.S.2d 419, 421, 533 N.E.2d 258, 260 (1988) (citations omitted). Not all alternative procedures that parties select are "reasonable" means of dispute resolution, however, and courts specifically have refrained from enforcing clauses that purport to appoint one party to the contract as the arbiter of disputes arising out of the contract. As the court stated in *In re Cross and Brown Co.,* 4 A.D.2d 501, 167 N.Y.S.2d 573, 575 (1st Dep't 1957):

> No party to a contract, or someone so identified with the party as to be in fact, even though not in name, the party, can be designated as an arbitrator to decide disputes under it. Apart from outraging public policy, such an agreement is illusory; for while in form it provides for arbitration, in substance it yields the power to an adverse party to decide disputes under the contract.

*See also Digeorgia v. American Federation of Musicians,* 17 Misc.2d 343, 186 N.Y.S.2d 517, 519 (Sup.Ct.1959) ("it is well-settled that a party to an agreement may not be an arbitrator in his own suit"); *George A. Fuller Company, Inc. v. Albin Gustafson Co.,* 55 A.D.2d 872, 390 N.Y.S.2d 416 (1st Dep't 1977) (architect on construction project could not serve as arbitrator of dispute where architect was itself a party to the dispute).

The strong sentiment expressed in *In re Cross and Brown* has, however, not yet been extended by the Court of Appeals beyond its party border to forbid the appointment of persons intimately connected to one of the parties, an apparent concession to New York law's even stronger allegiance to principles of freedom of contract. The New York Court of Appeals has recognized as "indisputable ... that the parties to an arbitration contract are completely free to agree upon the identity of the arbitrators...." *Matter of Astoria Medical Group,* 11 N.Y.2d 128, 133, 227 N.Y.S.2d 401, 404, 182 N.E.2d 85, 87 (1962), so much so that "where the contract expressly designated a *single* arbitrator who was employed by one of the parties or intimately connected with him, the courts have refuses to disqualify the arbitrator on the ground of either interest or partiality." *Id.,* 11 N.Y.2d at 136, 227 N.Y.S.2d at 406, 182 N.E.2d at 89 (emphasis in original; citations omitted). Thus, as a matter of New York law, " 'If the parties so agree, the relationship of an arbitrator to the party selecting him or to the matters in dispute will not disqualify him.' " *Matter of Siegel,* 40 N.Y.2d 687, 690, 389 N.Y.S.2d 800, 802, 358 N.E.2d 484, 486 (1976) (quoting Eager, *Arbitration Contract and Proceedings,* § 96, subd. 1, p. 272).

Under the strength of the above-noted Court of Appeals general authority, a diversity court should hesitate before disturbing more recent New York intermediate appellate court decisions applying the above principles to hold that even an employee of a party to a contract may appropriately be designated by the parties to a contract to serve as the arbiter of disputes arising under a contract. Those holdings recently have embraced construction contract clauses—including Article 8.03—that appoint the transit authority engineer as decisionmaker. *NAB Construction Corp. v. MTA,* No. 28670/87 (N.Y.Sup. May 18, 1988) (relying on *Matter of Siegel* to reject challenge to Article 8.03 of TA contract), *aff'd,* 148 A.D.2d 1020, 540 N.Y.S.2d 121 (1st Dept 1989), *leave to appeal denied,* May 18, 1989, LJ, p. 22, col. 4 (1st Dep't May 16, 1989), *app. dismissed,* 74 N.Y.2d 841, 546 N.Y.S.2d 557, 545 N.E.2d 871. *See also KG Industries, Inc. v. MTA,* No. 5761/86 (BN.Y.Sup. October 8, 1987), *aff'd,* 149 A.D.2d 992, 541 N.Y.S.2d 1007 (1st Dept 1989) (enforcing similar ADR requirement in MTA contract despite contractor's claim that permitting Authority's Chief Engineer to be decisionmaker violated public policy); *cf., Maross Construction Inc. v. New York Regional Transportation Authority,* 66 N.Y.2d 341, 343, 497 N.Y.S.2d 321, 322 (1985) (construing similar clause of regional transit authority providing for decisionmaker employed by contractual party).

There is contrary authority, *see Naclerio Contracting Co. v. City of New York,* 116

A.D.2d 463, 496 N.Y.S.2d 444 (1st Dept 1986) (construing City of New York public works clause appointing engineer as arbiter to be unenforceable), *aff'd on op. below*, 69 N.Y.2d 794, 513 N.Y.S.2d 115, 505 N.E.2d 625 (1987); *Laquila Construction, Inc. v. New York City Transit Authority*, No. 43304/89 (N.Y.Sup. Feb. 22, 1990), and notably the Court of Appeals recently declined to rule definitively on the question, *Thomas Crimmins Contracting Co. v. City of New York*, 74 N.Y.2d 166, 544 N.Y.S.2d 580, 584, 542 N.E.2d 1097, 1101 (1989). Unless and until that highest court shifts from its position as expressed in *Matter of Siegel*, however, it appears that resolution of claims by the Chief Electrical Officer under Article 8.03 is consistent with New York's law on arbitral appointment.

TA nevertheless bears the burden on this motion of showing that by undisputed facts that the Chief Electric Officer's decision was not "arbitrary, capricious or so grossly erroneous [as] to evidence bad faith." Article 8.03(c). Such a determination is not possible here because the movants' submissions do not reveal the contents of the record that was before the Chief Electrical Officer at the time of his determination (nor the governing rules of procedure, if any, that guided him). Although the Request submitted to the CEO has been presented to this court, other elements of the record apparently have not been, such as submissions, if any, that were made by parties, TA or MTA to assist the CEO's making of the "fair and impartial" decision required under the Article, or transcripts or minutes of any "advice of engineering or other experts" that was provided to the CEO to aid his determination.

In New York the *"path* of analysis, proof and persuasion by which the arbitrator reached his conclusion is beyond judicial scrutiny," *Central Square Teachers Association v. Board of Education of the Central Square School District*, 52 N.Y.2d 918, 919, 437 N.Y.S.2d 663, 419 N.E.2d 341 (1981) (emphasis added), and the parties may properly "substitute a different method for the adjudication of their disputes than those which would otherwise be available to them in public courts of law." *Matter of Siegel*, 40 N.Y.2d at 688–689, 389 N.Y.S.2d at 801, 358 N.E.2d at 485. Nevertheless, by definition even the most deferential standard of judicial "review" requires that there be preserved some record of predicate fact and prior proceedings which defines the subject matter of the determination from which "review" is sought. Lacking that here, a determination of whether the Chief Engineer's otherwise conclusive rulings were arbitrary or capricious or made in bad faith cannot be made. Summary judgment therefore would not now be available were it predicated solely upon the parties' commitment under Article 8.03 of determinations to the Chief Engineer, rather than on the numerous other grounds presented by TA as the primary ones entitling it to relief.

### CONCLUSION

For the reasons set forth above, the movants are entitled to summary judgment dismissing the action brought against them by Westinghouse. Submit judgment on notice.

It is so ordered.