## WESTINGHOUSE ELECTRIC CORPORATION, Plaintiff,

v.

## NEW YORK CITY TRANSIT AUTHORITY and Metropolitan Transportation Authority, Defendants.

### No. 89 Civ. 5227 (CSH).

United States District Court,
S.D. New York.

June 18, 1991.

Smith, Pachter, McWhorter & D'Ambrosio (Peter M. D'Ambrosio, John V. Snyder, Brian J. Vella, of counsel), Vienna, Va., Veltman, Karesh, Major & Farbman (John I. Karesh, Edward Weissman, of counsel), New York City, for plaintiff.

Albert C. Cosenza, New York City Transit Authority (Robin W. Weiner, Kevin Nathaniel Fox, of counsel), Brooklyn, N.Y., for defendants.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

In this action founded upon diversity of citizenship, 28 U.S.C. § 1332, plaintiff Westinghouse Electric Corporation ("Westinghouse"), a Pennsylvania corporation, brings this action against defendants New York City Transit Authority ("NYCTA") and Metropolitan Transportation Authority ("MTA") to recover damages and related relief arising out of a contract between Westinghouse and defendants for the sale and delivery of power rectifier equipment for use in the New York City subway system. Defendants move under Rule 12(b)(6), Fed.R.Civ.P. to dismiss the complaint for failure to state a claim upon which relief can be granted, or in the alternative for partial summary judgment under Rule 56.

## Background

On October 17, 1983, the MTA, acting by the NYCTA, awarded Contract P36222 to Westinghouse for the sale and delivery of power rectifier equipment to five substations of the New York City subway system. Power rectifier equipment converts electric power to the proper voltage and directs the power to the subway tracks to power the trains.

By letter dated February 3, 1989, Westinghouse advised F.D. Westfall, Jr., a NYCTA employee whose title is Chief Engineer Electrical, that Westinghouse was "suspending further performance effective February 3." In another letter dated February 3, 1989, Westinghouse instructed its subcontractor, Northstar Electrical Contracting, to suspend its performance.

In its February 3, 1989 letter to Westfall, Westinghouse referred to an earlier letter dated November 3, 1988. That letter, as paraphrased by Westinghouse in its February 3, 1989 letter, "notified the Transit Authority that its failure to resolve numerous long-standing design problems and other restraints and prohibitions on the performance of our work constituted a constructive stop order." The earlier November 3, 1988 letter, Westinghouse reminded Westfall, "requested the Transit Authority to resolve all outstanding performance problems within 90 days." In Westinghouse's perception, the NYCTA had not adequately responded to that request. The February 3, 1989 letter concluded:

> Because the Transit Authority has decided not to remove the restraints and impediments, our remaining contract work is either unavailable, thereby rendering us physically unable to perform, or materially altered so as to change the nature of our contract obligations. Therefore, we are suspending further performance effective February 3.

The NYCTA responded to Westinghouse in a letter signed by Westfall and dated February 8, 1989. That letter acknowledged Westinghouse's formal advice that Westinghouse was suspending further performance under the contract. "This is a breach of contract," Westfall wrote to Westinghouse. His letter went on to advise that in view of specified failures to perform on Westinghouse's part, "Westinghouse is hereby directed to discontinue all work pursuant to the contract." In addition, Westfall advised Westinghouse "that a recommendation will be made that it be held in default under the contract."

After a further exchange of correspondence, the NYCTA in a letter dated June 13, 1989 signed by Robin C. Stevens, Deputy Vice President, advised Westinghouse that the NYCTA had declared Westinghouse to be in default in the performance of its obligations under the contract. That letter concluded:

> Therefore, pursuant to Article 7.01 of the Contract, you are hereby deemed to be in default and your contract is hereby terminated.

As an enclosure to a letter dated June 21, 1989, Westinghouse submitted to Westfall at the NYCTA a Request for Additional Compensation and Time Extension. The request included the cost of additional labor, materials and equipment, compensation for field office overhead, and additional general and administrative expenses which Westinghouse and its subcontractor, Northstar, incurred to perform the contract due to the NYCTA's alleged failure to discharge its contract obligations. Westinghouse also sought compensation for damages caused by the NYCTA deletion of contract work items. Lastly, Westinghouse asked that the NYCTA's declaration that Westinghouse was in default under the contract be rescinded. Westinghouse's forwarding letter of June 21, 1989 concluded:

> Westinghouse requests a Superintendent's decision as required by Article 8.03 of the contract. Our right to a timely decision on this claim is not affected by the recent declaration of default.

Article 8.03 of the contract, to which Westinghouse referred in its June 21, 1989 letter, provides in its entirety as follows:

> ARTICLE 8.03. **Disputes.** (a) In the event the Contractor and Authority are unable to resolve their differences concerning a determination by the Superin-

tendent, the Contractor may initiate a dispute in accordance with the procedure set forth in this Article. Exhaustion of these procedures shall be a precondition to any lawsuit permitted hereunder.

(b) The parties to this contract authorize the Superintendent, acting personally, to decide all questions of any nature whatsoever arising out of, under, or in connection with, or in any way related to or on account of, this Contract (including claims in the nature of breach of contract of fraud or misrepresentation before or subsequent to acceptance of the Bidder's Proposal) and his decision shall be conclusive, final and binding on the parties. His decision may be based on such assistance as he may find desirable, including advice of engineering or other experts. The effect of his decision shall not be impaired or waived by any negotiations or settlement offers in connection with the question decided, whether or not he participated therein himself, or by any prior decisions of others, which prior decisions shall be deemed subject to review, or by any termination or cancellation of this Contract. All such disputes shall be submitted in writing by the Contractor to the Superintendent, acting personally, for his decision, together with all evidence and other pertinent information in regard to such questions, in order that a fair and impartial decision may be made. The Superintendent shall render his decision in writing and deliver a copy of the same to the Contractor.

(c) If the Contractor protests the determination of the Superintendent, the Contractor may commence a lawsuit in a Court of competent jurisdiction of the State of New York under Article 78 of the New York Civil Practice Law and Rules or a United States Court in New York, under the procedures and laws applicable in that court, it being understood the review of the Court shall be limited to the question of whether or not the Superintendent's determination is arbitrary, capricious or so grossly erroneous to evidence bad faith. The Contractor must allege in his complaint and prove such submission, which shall be a condition precedent to any such action. No evidence or information shall be introduced or relied upon in such an action that has not been so presented to the Superintendent personally.

(d) Neither the requirements of this **Article** nor the time necessary for compliance therewith, however, shall affect the time to have accrued for purposes of any statute controlling actions against the Authority, and the time of such accrual shall be determined without reference to this paragraph.

Article 1.02(10) of the contract defines "Superintendent" to mean "the General Superintendent ... or his duly authorized representative and any successor or successors or any deputy or substitute who shall be appointed by the Authority to administer the Contract." In the case at bar Westfall as Chief Electrical Officer was the Superintendent for purposes of dispute resolution under Article 8.03.

By letter dated July 26, 1989, Westfall advised Westinghouse that he rejected Westinghouse's claims. Westfall's July 26, 1989 letter stated in part:

> ... in view of the submission of the dispute by both parties, I find that as a result of the willful abandonment of and failure to complete the contract by Westinghouse, the contractor has forfeited any claim for any compensation by the Authority, and that the Authority is entitled to recover from Westinghouse all expenses and damages as stated in Chapter 7 of the contract.

Westinghouse filed this action for breach of contract and for rescission on August 2, 1989.

### Discussion

The years between the awarding of the contract in October 1983 and Westinghouse's suspension of performance in February 1989 gave rise to a host of recriminations between the parties. In essence, Westinghouse contends that during that interim, the NYCTA failed to give Westinghouse timely access to the substation facilities so that the installations could take

place; and, even after belated granting of access, the NYCTA "failed and refused to resolve dozens of physical, design, engineering and scheduling restraints upon Westinghouse's work." Main Brief at 3. The result of those accumulated delays, Westinghouse contends, "is that the contract is so materially different from that originally awarded to Westinghouse as to be almost unrecognizable." *Id.* at 4. In addition, Westinghouse says that its work "was restrained by over two dozen design, engineering, scheduling and performance problems that made it impossible for Westinghouse to proceed with almost all remaining work." *Id.* at 5. Westinghouse regards the project work to have been "effectively suspended" by the NYCTA, whose conduct brought about "a constructive stop work order." *Id.* at 5, 6. Westinghouse relies upon these allegations to justify its decision to suspend performance on February 3, 1989. Westinghouse's position, in essence, that prior to that time, the NYCTA had breached the contract in material, fundamental respects.

The NYCTA does not agree with any of this. It contends that no representations were made to Westinghouse respecting the exact dates when the substations would be turned over to the contractor;[1] that Westinghouse contractually assumed the risk of such delays as did occur;[2] and that Westinghouse's performance of the contract was unsatisfactory. Main Brief at 3–4. The parties' contentions reveal myriad other factual disputes, such as the extent of work available for Westinghouse to perform as of the date of its suspension of performance, and the extent and nature of contracted-for work deleted from the contract by the NYCTA.

Because both parties submit and rely upon volumes of materials falling outside the boundaries of the pleading, I treat the motion, as the parties have done, for summary judgment under Rule 56.

It requires no detailed analysis to conclude that factual disputes concerning the parties' performance, such as those just summarized, may not properly be resolved by summary disposition.

The question of substance presented by defendants' motion arises out of that alternate dispute resolution machinery found in Article 8.03 of the contract. As an alternative basis for summary judgment, defendants contend that Westinghouse's unilateral suspension of performance and failure to seek timely recourse under Article 8.03 preclude this action.

■ In response to that contention, Westinghouse first argues that Article 8.03 contravenes public policy and is accordingly void and unenforceable.

I do not agree. Since subject matter jurisdiction in this Court is derived from diversity of citizenship, the public policy to be considered is that of the State of New York. In *Westinghouse Electric Corporation v. New York City Transit Authority*, 735 F.Supp. 1205, 1227 (S.D.N.Y.1990), Judge Sweet considered a claim that the identical provision in a comparable contract violated public policy, and concluded that "resolution of claims by the Chief Electrical Officer under Article 8.03 is consistent with New York's law on arbitral appointment." While Judge Sweet granted summary judgment to the defendants on an alternative ground, so that his analysis of the dispute resolution provisions in the contract may arguably (as Westinghouse argues at bar) be characterized as dicta, nevertheless I find his analysis persuasive. *See* 735 F.Supp. at 1225–1227.

The wording of Article 8.03 conferred upon the Superintendent (in this case, the Chief Electrical Officer) the authority to resolve both factual disputes and questions of law. *See Maross Construction Inc. v. New York Regional Transportation Au-*

---

**1.** Article 2.01 of the contract recites that "[i]t is estimated" that the five substations would be ready for delivery and installation of the contracted-for equipment at specified dates.

**2.** Article 1.09(g) of the contract provides:

It is understood that the Contractor has made allowance in the prices stipulated in the Price Schedule for all expense, loss, risk, and damage due to the work of other contractors and persons in or about the Railroad and Project and due to the operation of the Railroad.

*thority,* 66 N.Y.2d 341, 343–44, 497 N.Y.S.2d 321, 488 N.E.2d 67 (1985); *cf. Crimmins Contracting Co., Inc. v. City of New York,* 74 N.Y.2d 166, 170–73, 544 N.Y.S.2d 580, 542 N.E.2d 1097 (1989). The question then becomes whether the Superintendent's status as an employee of one of the contracting parties violates public policy. As Judge Sweet observed in his careful analysis in *Westinghouse Electric Corp.,* the New York Court of Appeals has articulated the general propositions that "parties to an agreement may not seek a declaration of their contract rights when their agreement specifies a different, reasonable means for resolving such disputes," *Kalisch–Jarcho, Inc. v. City of New York,* 72 N.Y.2d 727, 732, 536 N.Y.S.2d 419, 533 N.E.2d 258 (1988); and "[i]f the parties so agree, the relationship of an arbitrator to the parties selecting him or to the matters in dispute will not disqualify him." *Matter of Siegel,* 40 N.Y.2d 687, 690, 389 N.Y.S.2d 800, 358 N.E.2d 484 (1976). New York intermediate appellate courts have applied those principles "to hold that even an employee of a party to a contract may appropriately be designated by the parties to a contract to serve as the arbiter of disputes arising under a contract. Those holdings recently have embraced construction contract clauses—including Article 8.03—that appoint the Transit Authority Engineer as decision maker." *Westinghouse Electric Corp. v. New York City Transit Authority, supra* at 735 F.Supp. 1226 (citing cases).

As Judge Sweet also recognized, "there is contrary authority," *id.* at 1226 (citing cases). Judge Sweet also said that "the Court of Appeals recently declined to rule definitively on the question," citing *Crimmins. Id.* at 1227. In point of fact, however, the question left open in *Crimmins* was whether an alternate dispute resolution procedure empowering defendant's own employee to resolve all legal issues of contract interpretation, *binding only plaintiff,* is unenforceable "because it violates public policy, is illusory and lacks mutuality." 74 N.Y.2d at 171, 544 N.Y.S.2d 580, 542 N.E.2d 1097. In the case at bar, the Superintendent's determination is binding upon both parties. *See* Article 8.03(b).

The greater weight of intermediate appellate authority in New York upholds the validity of Article 8.03, in a manner consistent with the New York Court of Appeals' general holdings in the arbitral field. I agree with Judge Sweet that, at least until the Court of Appeals shifts from those general propositions in the particular context of municipal contracts, a provision like Article 8.03 is valid and enforceable.

■ That being so, the final question is whether the Chief Electrical Officer's rejection of Westinghouse's claim in his letter decision dated July 26, 1989 was "arbitrary, capricious or so grossly erroneous to evidence bad faith," those being the controlling criteria under Article 8.03(c).

The Chief Electrical Officer rejected Westinghouse's claims on the ground that Westinghouse, having unilaterally abandoned the contract by suspending work, forfeited any claim for compensation by the NYCTA. While defendants' reply brief at 33 argues that the decision was "based *in part* upon Westinghouse's abandonment of the contract," the Westfall letter does not support that expanded a construction. Nonetheless, I am not persuaded that the Superintendent's determination was "arbitrary, capricious or so grossly erroneous to evidence bad faith."

Article 2.01 of the contract obligated Westinghouse to begin work within 10 days after the notice of award, "and shall thenceforth prosecute the Work continuously and diligently." Chapter 4 deals with "changes to the contract," and Articles 4.03–4.07 to "Extra Work," concept with which it is necessary to deal, since Westinghouse argues that it was required to perform, and is entitled to compensation for, work above and beyond the contract price. Article 4.06 provides for negotiations relating to extra work orders:

> Notwithstanding anything in this Chapter to the contrary, the Contractor and the Authority shall attempt to negotiate a price allowance, addition or deduction as the case may be, and a modification to

the schedule for completion of the work related to any Extra Work Order. In the event that the parties are unable to agree, then the Authority may direct the Contractor to proceed in accordance with the other provisions of the Contract. The contractor, however shall have the right to dispute the price or schedule allowance in accordance with **Article 8.03—Disputes.**

The contractual structure is clear enough. Westinghouse was obligated to prosecute the work "continuously and diligently," and to submit disputes to the Superintendent under Article 8.03, while continuing the work to the maximum extent possible. There is a discernible public policy underlying such provisions. *Kalisch–Jarcho, Inc. v. City of New York,* cited *supra* for the general proposition that parties may specify in their contracts means for resolving disputes, arose in the particular context of a municipal construction contract delineating a procedure to be followed for resolving disputes occurring during the project as to whether certain work or was not within the contract. The contract provided that the Commissioner of the Department of Sanitation (the functional equivalent of the Superintendent in the case at bar) would, as the last step in the dispute resolution process, make that determination. If he determines "that the disputed work is contract work and so notifies the contractor, the contractor has specifically undertaken an obligation to perform that work and postpone any claim for additional compensation until after contract completion." 72 N.Y.2d at 733, 536 N.Y.S.2d 419, 533 N.E.2d 258. By that provision, the Court of Appeals said, the parties:

> expressly agreed upon a step-by-step procedure which preserves the City's bargained-for right to have a multi-contractor project proceed to conclusion without actual or threatened costly litigation interruptions—the present action is already three years old—and at the same time preserves the contractor's right to seek judicial resolution of claims for additional compensation for work it be-

lieves falls outside the contract. *Id.* at 735, 536 N.Y.S.2d 419, 533 N.E.2d 258 (footnote omitted).

So in the case at bar, Westinghouse, a sophisticated corporate contractor, agreed by contract to continue work while seeking resolution of disputes in a particular manner. As noted, the arbiter of disputes was employed by the other party to the contract, and judicial review of his decision is limited; but neither factor offends public policy. Westinghouse was at liberty to reject such a contract, but it agreed to it, and is bound by its terms.

Westinghouse excuses its failure to submit its claims for Article 8.03 resolution before suspending work on February 3, 1989 by arguing, first, that Article 8.03 violates public policy; and, secondly, that the procedure was futile because the Superintendent would have denied the claim. On that latter ground, Westinghouse says in its main brief at 36:

> The Transit Authority was fully aware of all the restraints on Westinghouse's work, yet refused to remove them so that Westinghouse could complete the project. There is no factual support for the assertion that submission of an Article 8.03 dispute would improve the situation. The Transit Authority would have ignored it consistent with its practice of ignoring Westinghouse's earlier requests for cooperation.

I have rejected the first argument that Article 8.03 offends public policy. The second argument, that of futility, itself offends the public policy articulated in *Kalisch–Jarcho.* A party to a contract who has agreed to a particular procedure for resolving disputes cannot disregard that procedure and unilaterally terminate the contract, on the assumption that had it followed the agreed-upon procedure, it would have lost the dispute. That this approach offends public policy implicated by public contracts requires no further analysis.[3]

---

**3.** The approach also runs counter to the express provision in Article 8.03(a) that "[e]xhaustion of these procedures shall be a precondition to any lawsuit permitted hereunder."

Given the wording of the contract and these concerns, it is impossible for me to conclude that the Chief Electrical Officer acted in an arbitrary, capricious or grossly erroneous manner when he decided that Westinghouse, having stopped work under the contract without invoking Article 8.03, could not several months later attempt to do so.

### Conclusion

For the foregoing reasons, the defendants' motion for summary judgment is granted. Plaintiff's cross motion for partial summary judgment is denied.

The Clerk of the Court is directed to dismiss the complaint with prejudice.

It is SO ORDERED.